# In the Circuit Court for Anne Arundel County
## State of Maryland

**James Malamatis**
1655 Trawler Lane
Annapolis, Maryland 21409,
  *Plaintiff.*

**v.**

**ATI Physical Therapy, Inc.**
90 Remington Blvd.
Bolingbrook, IL 60440
  *Defendant.*

C-02-CV-21-000940

**Case No.** _____
[JURY TRIAL DEMANDED]

DAN R. MASTROMARCO
Federal Bar ID: 18243
danmastromarco@gmail.com
THE MASTROMARCO FIRM, LLP
703 Giddings Avenue
Annapolis, MD 21401
T: 410.349.1725
F: 410.268.1597
*Attorney for Plaintiff*
_____/

## COMPLAINT

NOW COMES the above-entitled Plaintiff James Malamatis ("Mr. Malamatis"), by and through the undersigned counsels, in order to bring this action against Defendant ATI Physical Therapy, Inc. ("ATI"). For his causes of action, Mr. Malamatis states as follows:

## I. THE PARTIES

1

1.    Mr. Malamatis resides in the County of Anne Arundel, State of Maryland.

2.    At all times material hereto, Mr. Malamatis was employed by ATI.

3.    ATI is organized and existing under the laws of the State of Delaware with a registered office at Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

4.    ATI maintains a headquarters at 790 Remington Blvd., Bolingbrook, IL 60440.

5.    ATI operates approximately 900 clinics across more than 24 states within the U.S. and offers physical therapy services and specialty therapies, 50 of which are in Maryland.

## II.  JURISDICTION AND VENUE

6.    Plaintiff has fully complied with all prerequisites to jurisdiction under Title VII.

7.    Personal Jurisdiction in Maryland is predicated upon Maryland Code, Courts and Judicial Proceedings §6-103, which provides that service of a summons establishes personal jurisdiction over a defendant when general jurisdiction exists in Maryland.

8.    General jurisdiction exists when corporations transact any business or perform any character of work or service in the State, contract to supply services, or cause injury in the State.

9.      ATI has availed itself of the forum state by engaging in continuous and systematic contracts here (*i.e.,* which constitute doing business in the forum); most notably, by actively, continuously and systematically overseeing the hiring, disciplining and firing of employees here.

10.     As further set forth below, ATI regularly employs workers in Maryland, one of whom was Plaintiff.

11.     Specific jurisdiction in Maryland is predicated on Md. Courts and Judicial Proceedings Code §6-103 (Maryland's Long Arm Statute), for one of more of the following reasons: (a)  ATI has transacted business and performed work here, (b) ATI has contracted to supply services here, (c)  ATI  has caused tortious injury by an act or omission here (*e.g.,* by  wrongfully terminating Mr. Malamatis), and (d) ATI uses and is believed to have an interest in real property here.

12.     Jurisdiction in this Court is proper under §706(f)(3) of Title VII, 42 U.S.C. §2000e-5(f)(3).

13.     Venue is proper in Anne Arundel County because all the events or omissions giving rise to the claim occurred in Maryland.  Venue is also proper under §706(f)(3) of Title VII, 42 U.S.C. §3000e-5(f)(3).

### III.  SUMMARY

14.    Mr. Malamatis files this lawsuit to recover economic and non-economic damages he has sustained fromage discrimination directed towards him by his employer, ATI.

15.    From the date of his engagement with ATI in March of 2018 until his wrongful termination on September 6, 2019, Mr. Malamatis endured a systematic, relentless and escalating campaign of harassment as the oldest worker in his department.

16.    At the hands of his direct superiors, Mr. Charlton Cooper ("Mr. Cooper") and Ms. Priya Amin "Ms. Amin"), ATI's campaign of harassment against Mr. Malamatis began with the assertion and condonement of disparaging and hostile remarks about his age and memory.

17.    This was followed by an edict by Ms. Amin to Mr. Cooper "ride" Mr. Malamatis "hard," which implied disparate treatment.

18.    When Mr. Malamatis complained of the degrading remarks, and demanding that they cease, ATI retaliated against him through other means.

19.    Escalating her campaign of disparate treatment against Mr. Malamatis against his complaints, Ms. Amin subjected Mr. Malamatis to job performance standards uniquely applicable to him, gave Mr. Cooper a directive to single Mr. Malamatis out for aggressive oversight, placed Mr. Malamatis on a Performance Improvement Plan (or "Growth Plan") (hereafter referred to as a "PIP") with ill-

defined and subjective standards, denied Mr. Malamatis bonuses and then ultimately terminated him – without so much as bothering to assess him against the amorphous standards she and Mr. Cooper ostensibly imposed as a basis for evaluating his performance.

20.     As a result of seeking to utilizing the avenues available to him in an attempt to stop this harassment, employees of ATI, then retaliated against Mr. Malamatis further by failing to offer him any severance normally offered to younger employees.

21.     The harassment and termination of Mr. Malamatis was wrongful and abusive, designed to disparage Mr. Malamatis before he peers and colleagues, defame him, and tarnish his reputation with clients, professional associates and the industry to which he devoted his career.

22.     When engaging in this retaliation, ATI knew Mr. Malamatis was intending to vindicate his right by filing an EEOC complaint which he ultimately did.

### IV.  COMMON ALLEGATIONS

*Hiring and Performance.—*

23.     When Mr. Malamatis was hired in March of 2018, he was engaged by a Merritt MacKenzie, who had since moved on in his career.

24.    While with ATI, Mr. Malamatis worked as "Practice Partner/Sales Consultant" for the region commonly known as 'Baltimore West', which encompassed several counties within Maryland and parts of Baltimore City.

25.    Despite his title as a "Practice Partner," Mr. Malamatis was in essence an old-fashioned salesman for ATI, whose primary responsibility was generating referrals.

26.     Within this region, he worked to introduce providers (most orthopedic surgeons) to the ATI facilities network.

27.    Mr. Malamatis was evaluating primarily on the ability to obtain referrals from the medical providers, and his bonus was determined on that basis.

28.    Malamatis came to work with ATI after an inveterate and successful career within the orthopedic profession; in fact, he devoted more than 15-years to orthopedic and neurosurgery sales.

29.    As alleged *supra* Mr. Malamatis was 64 years-of-age when began employment with ATI, and this made him the oldest employee in a team of employees where the average years-of-age was, upon information and belief, about 25.

30.    No workers had attained Mr. Malamatis' age, and only a handful were over the age of 55.

31.    When Mr. Malamatis sought work with ATI, he had hoped that that position would be his last, continuing his career's work in the medical sales field over the course of decades.

32.    When seeking the position, Mr. Malamatis made that fact known to ATI.

33.    In the auspicious beginning of his tenure at ATI,  Mr. Malamatis was poised to continue his demonstrable pattern of achievement in medical-related field.

34.    During the time Mr. Malamatis was with ATI, by virtually all metrics, he proved to be an extraordinarily well-performing employee who consistently contributed to ATI's bottom line.

35.    As one of the top performers in ATI, he was praised by management, even during the period in which his performance was being questioned by Ms. Amin and Mr. Cooper.

36.    At all times material hereto, Mr. Malamatis' sales results were superior to other employees.

37.    By way of example, Mr. Malamatis significantly increased 'Initially Seen Evaluations' ('ISEs'); specifically, by increasing the number of ISEs from roughly 2,500 to 3,500 within a 12-month period.

38.    That Mr. Malamatis was a top-performing salesperson was demonstrated by the fact that he was only one of a handful of top producers for three straight

quarters, and that, unlike many employees (who are still with ATI), generated business sufficient to meet the quotas for referrals.

39.     This was no anomaly: Mr. Malamatis was again a seasoned veteran of medical sales.

40.     Mr. Malamatis' success was the product of lifetime of a consistently salutatory record of achievement that preceded Mr. Malamatis' tenure with ATI.

41.     As previously alleged, during his time with ATI, Mr. Malamatis also enjoyed excellent performance reviews from corporate leadership (that is, apart from the discriminating supervisor, Ms. Amin).

42.     At the 2019 corporate national meeting, management publicly praised Mr. Malamatis for having attained a very high sales goal for three consecutive quarters.

43.     There, ATI publicly bestowed upon Mr. Malamatis "employee-of-the-year" honors.

44.     Indeed, ATI's management characterized his performance as "outstanding!".

45.     And when he achieved a "100 percent quota," Mr. Malamatis' direct manager exclaimed to him that such results "almost never happen."

46.     His superiors (again with the exception of Ms. Amin) also praised Mr. Malamatis in other ways, both privately and at "ride-alongs".

***Harassment and Discrimination.--***

47.     Mr. Malamatis' performance, however, stood in stark contrast to the

treatment he received at the hands of Ms. Amin.

48.    No  success (even those which demonstrably inured ot the company's bottom line) seemed to earn Mr. Malamatis praise from either Ms. Amin, or her underling (and Mr. Malamatis' immediate supervisor), Mr. Cooper.

49.    Unable to fire Mr. Malamatis on the basis of performance, but motivated by a discriminatory agenda to do so, Ms. Amin manufactured a pretext for firing Mr. Malamatis.

50.    In fact, in the wake of Mr. Malamatis' exemplary performance record – and seemingly as a result of it -- Ms. Amin took the unprecedent step of targeting Mr. Malamatis for selective harassment.

51.    Though purposeful actions that began soon after Ms. Amin became Mr. Malamatis' report, strengthening progressively until she terminated Mr. Malamatis, Ms. Amin initiated campaign of beratement, marginalization and disparagement of Mr. Malamatis.

52.    Barring the ability to criticize Mr. Malamatis on the basis of his performance, Ms. Amin, tasked Mr Chas Cooper of her staff with "riding" Mr. Malamatis "hard."

53.    And she instructed Mr. Cooper to " "be hard on [Mr. Malamatis]."

54.    In fact, rather than so much as acknowledging his good performance, Ms. Amin tasked Mr. Cooper to build a record that would establish a predicate for

termination, precipitating weekly if not more frequent reviews as Mr. Cooper assembled his bill of particulars.

55.    In the words of Mr. Cooper to Mr. Malamatis, "there will be a time when your performance will not protect you from Ms. Amin."

56.    And when Mr. Malamatis questioned why he was being singled out for this disparate treatment, Mr. Cooper advised Mr. Malamatis directly that he was fulfilling the "queen's" orders (in his words) to "ride Mr. Malamatis hard" and "not to be easy on him."

57.    Mr. Cooper's dutiful haranguing of Mr. Malamatis at Ms. Amin's behest denigrated into a weekly berating of Mr. Malamatis' minor grammatical mistakes and other trifling foibles, laced with innuendos that cast aspersions on Mr. Malamatis' age.

58.    Ms. Amin was did not task Mr. Cooper with riding the younger employees.

59.    Ms. Amin was did not task Mr. Cooper with being hard on the younger employees.

60.    Ms. Amin was did not task Mr. Cooper with building a record to establish a cause for termination of younger employees.

61.    Mr. Cooper did not function as a grammarian of the younger employees.

62.    And as telltale signs of the what motivation  lay behind the haranguing, during staff meetings, Mr. Cooper would frequently question Mr. Malamatis'

memory publicly asking, "Are you having a hard time remembers this, Jim" or "Do you have memory problems?".

63.    On numerous occasions, when berating Mr. Malamatis, Mr. Cooper would ask Mr. Malamatis pointedly and accusatorily if there was some problem with his memory, insinuating that he had dementia.

64.    ATI even put this in writing, claiming that Mr. Malamatis  "was not organized and would forget important details"; "had demonstrable difficulty grasping and retaining command of the ATI Way for Sales"; and "failed to recall the names of staff at various offices".

65.    Mr. Malamatis was criticized for not having the same computer skills as millennials, which was code for generational or age-related bias.  And at a symposium, Ms. Amin advised Mr. Malamatis that "perhaps [you] should work out to be more buff" in a not so subtle (*albeit* admittedly very odd) reference to the fact Mr. Malamatis' physique was that of an older gentleman.

### *Retaliation.--*

66.    These aspersions relating to Mr. Malamatis' age were levied against him so frequently that Mr. Malamatis implored Mr. Cooper to stop, stating that he was hurt by the calumnies.

67.    In July of 2019, Mr. Malamatis directly complained to Mr. Cooper that he was offended by his references to age or dementia.

68.    In doing so, Mr. Malamatis was not only exercising his rights by the

Employee Handbook, but he was also fulfilling his responsibility.

69.    And as the Handbook further provides:

*ATI is committed to providing a workplace that is free from all forms of discrimination, including harassment. ATI will not tolerate abusive conduct by anyone—including employees, vendors or clients of ATI—which harasses, disrupts or interferes with another person's work performance or which creates an intimidating, offensive or hostile working environment…. Harassment consists of unwelcome conduct, whether verbal, physical or visual, that is based upon or derisive of a person's … age … or other legally protected characteristics or conduct, where the unwelcome conduct affects tangible job   benefits, unreasonably interferes with an individual's work performance, or creates an intimidating, hostile or offensive working environment.*

70.    Elsewhere, the Handbook provides:

*Each supervisor is responsible for maintaining the workplace free from any type of harassment. This is accomplished by … taking prompt, appropriate action to investigate and address any instance of inappropriate conduct. Specifically, a supervisor must address an observed incident of harassment or a complaint with seriousness … and take action to end any harassment or other inappropriate conduct, including disciplinary action or termination of employment where*

71.    And elsewhere the Handbook promises to protect whistleblowers:

*ATI will not retaliate against any person for making a good faith complaint under this policy, regardless of the outcome of the investigation. Similarly, ATI will not retaliate against any person (other than someone who is found to have violated this policy) for providing truthful information in connection with an investigation under this policy in any respect. Any employee of ATI who retaliates against another employee for utilizing in good faith the procedures in this policy will be subject to discipline, up to and including termination.*

72.    And it requires reporting of retaliation too:  "any employee who becomes aware of retaliation against anyone for exercising his or her rights under this policy must immediately report such conduct…."

73.    In fact, "[v]iolation of the Company's policies prohibiting harassment or retaliation" [such as presumably the requirement to report it], it subject to termination immediately.

74.    As the Employment Handbook provides: "Any employees … with … concerns about any type of discrimination in the workplace *are (sic) responsible* to bring these issues to the attention of their immediate supervisor or the EEO Coordinator."

75.    This mandate is reinforced elsewhere in the Handbook where it states: "Any employee who becomes aware of discrimination or harassment in violation of the policies stated above *must immediately* report the matter to his or her immediate supervisor or, if the employee prefers, to another member of management or Human Resources."

76.    However, rather than investigate Mr. Malamatis' well-founded and mandatory complaints of age discrimination, ATI decided the best course of action would be to silence these complaint through retaliatory action.

77.    Mr. Cooper did not investigate Mr. Malamatis grievance as she was required to do.

78.    Ms. Amin did not investigate Mr. Malamatis' grievance.

79.    Instead, ATI responded on August 30, 2019 by placing Mr. Malamatis on the PIP engineered to lay the predicate for termination.

80.    And in the five or six months preceding his firing, Ms. Amin's targeted harassment campaign against Mr. Malamatis escalated in viciousness, frequency and intensity.

81.    Every week Mr. Malamatis would receive new orders and directives from Ms. Amin, that were funneled down from her surrogate, Mr. Cooper.

82.    Mr. Cooper responded by continuing the needling, because he thought that was what Ms. Amin wanted him to do; or, more likely (given his reference to royal edicts), directed him to do.

83.    The infractions Mr. Cooper cited against Mr. Malamatis ranged from the mundane to the ridiculous –from minor grammar mistakes to his failure to respond with requisite alacrity.

84.    Throughout this time, Mr. Cooper would remind Mr. Malamatis that he was developing an extensive file of foibles in order to await the moment that Mr. Malamatis' performance numbers would fall.

85.    And ultimately, not willing to wait for that to occur, Ms. Amin sought to

raise the performance bar for Mr. Malamatis, holding him to a new and heightened standard without justification.

86.    The "growth plan" itself *was* the discriminatory action.

87.    Mr. Malamatis was the only Practice Partner placed on the growth plan out of nine other "Practice Partners" over the age of 40.

88.    Ms. Amin did not discharge employees under the age of 40 for the transgressions for which she cited Mr. Malamatis.

89.    Ms. Amin did not place younger employees on a PIP for the transgressions for which she cited Mr. Malamatis.

90.    Ms. Amin did not hold  any younger worker to account for the same performance issues she ultimately terminated Mr. Malamatis for.

91.    Mr. Cooper harangued no other employee like he did Mr. Malamatis..

92.    No other employee was subject to such intense oversight; such hypercritical faultfinding; and no other employees had a supervisor specifically engaged to build a case against them, especially those with superior sales numbers.

93.    No other employee even close to Mr. Malamatis' age and within Ms. Amin's supervision was placed on a "growth plan"; no other employee who had performed as well as Mr. Malamatis in sales was placed on a growth plan; and no employee who had been simultaneously praised had been placed on a  growth plan.

94.    Indeed, while Mr. Malamatis' superior performance would have suggested

more and not less freedom of operation; the converse actually abided; Ms. Amin's conducted less oversight of younger, less credentialed employees with an inferior sales performance record.

95.     Again, no other employee was singled out for such disproportionate harassment as Mr. Malamatis; and that resulted because of his age.

96.     In the wake of this unrelenting harassment and suspecting that ATI was seeking to generate a pretext for termination, Mr. Malamatis attempted to secure his personal personnel records.

97.     He was informed he was entitled to request this by the *Employment Policy Handbook*, in the same manner he and other employees were entitled to use the *Open Door Policy*.

98.     In fact, Mr. Malamatis sought to secure his full personnel records on August 18, 2019 as a prelude to a potential EEOC complaint.

99.     But once again Mr. Malamatis suffered disparate treatment: ATI refused to give him all the records he requested.

100.    In fact, shortly after making his request (again, likely as a result of it), Ms. Amin terminated Mr. Malamatis, despite the existence of a non-retaliation clause riddled throughout the Handbook.

101.    The disparate treatment of Mr. Malamatis continued even after termination.

102.   On information and belief, when other employees had been terminated, ATI had offered them a severance as a matter of course.

103.   Mr. Malamatis was not offered a severance.

104.   When ATI took these disparate and retaliatory actions to terminate Mr. Malamatis, they did so with vindictiveness, knowing that when a termination like this occurs, older workers like Mr. Malamatis are disproportionately affected.

105.   On national statistics alone (younger workers) the average (mean) duration, in weeks of unemployment, for the month of August, was 22.1 weeks.  The median duration was 12.8 weeks. But for workers of Mr. Malamatis age, the average duration was about 25% longer.  And about 80 percent are still unemployed 27 weeks after termination.

### *Pretextual.-*

106.   ATI has taken the position that Mr. Malamatis was fired "solely for performance issues,"  and that "[that] whether or not Mr. Malamatis was performing well" based on sales recognition should simply "be disregarded because only ATI's assessment of Mr. Malamatis' performance [on some unspecified basis is what] matters."

107.   However, this position is merely pretextual.

108.   Performance was not the real reason for his termination: age discrimination and relation were.

109.    And what the evidence suggests is that Mr. Malamatis was not terminated for lack of performance; he was terminated in spite of performing.

110.    In response to the EEOC charge, ATI stated that "[s]hortly after Mr. Malamatis started at ATI, his performance became a concern;" however, ATI has not explained why, if that is the case, they did  not get around to terminating Mr. Malamatis for a year-and-a-half of enduring these concerns.

111.    What the full records reveal is that Mr. Malamatis' supervisor Ms. Amin, never questioned his performance until late in May of 2019, almost a year and one-half after he was hired.

112.    And ATI never has explained why they kept silent about Mr. Malamatis' deficiencies that were the alleged grounds for his termination until the advent of Ms. Amin who directed that her subordinate "ride" Mr. Malamatis "hard."

113.    By the accolades he received, ATI's management never actually perceived Mr. Malamatis as having performance problems.

114.    In May of 2019, faced with Mr. Malamatis' superior performance, Ms. Amin did the only thing she could do to effectuate her intent to terminate Mr. Malamatis – she chose to inequitably raise the standards for Mr. Malamatis to meet.

115.    Upon information and belief, Ms. Amin raised the sales quota standards for Mr. Malamatis so as to make it difficult for him to achieve these quotas.

116.    In fact, in doing so, Ms. Amin pushed the goal post further forward for Mr. Malamatis than for any member of her team

117.    Raising the standards disproportionately for Mr. Malamatis was done in order to set up Mr. Malamatis' failure.

118.    And the pretextual nature of the termination on the basis of Mr. Malamatis' supposed performance is evident by the vagaries of the criticisms against Mr. Malamatis, which fail to apply any objective criteria.

119.    In the nitpicking reviews, Mr. Cooper (again the one Ms. Amin charged with "riding" Mr. Malamatis, stated that "Mr. Malamatis had trouble with … day-to-day administrative functions"; "did not spellcheck … his emails and text messages"; "was not engaging in an impactful manner …"; "did not participate by sharing his best practices and difficult experiences;" "exhibited difficulty fulfilling his job responsibilities"; and "failed to show requisite improvement in the identified areas."

120.    These thoroughly subjective factors were not equitably applied across-the-board -- none were similarly imposed upon younger workers.

121.    And what is most telling, on September 6, 2019, when she discharged Mr. Malamatis, Ms. Amin tellingly failed to mention any of the performance issues ATI told EEOC were entirely responsible for his termination.

122.   In point of fact, Ms. Amin did not give Mr. Malamatis a chance to complete the 30-day PIP, and she offered no explanation for his discharge prior to completion.

123.   In fact, Ms. Amin and Mr. Cooper fired Mr. Malamatis during his attendance at a meeting they misrepresented to him was all about evaluating his business plan under the guise that his employment was continuing, which he dutifully prepared for in advance of the termination meeting.

124.   According to ATI's response to the EEOC, Mr. Malamatis' performance never improved after he was placed on the PIP; and that was why they discharged him.

125.   However, Mr. Malamatis' four-week *improvement plan* – provided to him just before his termination – gave no indication of what needed to be improved.

126.   At no time, did ATI afford Mr. Malamatis a measurement of how well he was progressing towards the  criterial he needed to meet under the PIP.

127.   And while Mr. Malamatis worked as best he could to achieve the amorphous improvement objectives in the PIP, Ms. Amin and Mr. Cooper plotted an ambush meeting against him.

128.   Having concocted this plan, Ms. Amin summoned Mr. Malamatis to a meeting ostensibly to discuss Mr. Malamatis' business plan in anticipation of continuing employment.

129.   At the meeting billed to discuss this plan, however, Mr. Cooper and Ms. Amin abruptly fired Mr. Malamatis.

130.   ATI  didn't wait until the end of the PIP to discharge Mr. Malamatis.

131.   At the time of termination, ATI refused to give Mr. Malamatis a reason for his termination; in fact, Ms. Amin remained stone-faced in the meeting.

132.   And indeed, ATI lured Mr. Malamatis into the firing office under the guise that he was to discuss a way forward.

133.   Ms. Amin's action of course was not only disingenuous: Mr. Malamatis' supervisors utter failure to communicate concrete improvement milestones lay bare the fact that Mr. Cooper and Ms. Amin never intended give Mr. Malamatis a chance to improve his performance – they simply wanted him gone.

## V.    THE COUNTS

### COUNT I: VIOLATION OF THE  AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA) - 29 U.S.C. §621, et seq.

134.   The preceding allegations are incorporated within this count, paragraph-by-paragraph, as if fully set forth herein.

135.   At all times material hereto, Mr. Malamatis was an "employee" as defined in 29 U.S.C. §630(f).

136.   At all times material hereto, ATI  was his "employer" as defined in 29 U.S.C. §630(b).

137.   ATI  discriminated against Mr. Malamatis because of his age within the meaning of 29 U.S.C. §623 with respect to his compensation, terms, conditions, or privileges of employment.

138.   Specifically, ATI discriminated against Mr. Malamatis when it created a hostile work environment disparaging him on account of his age.

139.   ATI  discriminated  against Mr. Malamatis with respect to bonuses and other emoluments of success based upon his age, when it altered the terms and conditions, and privileges of employment so as to make it comparatively more difficult for Mr. Malamatis to meet performance standards than his colleagues.

140.   Accordingly, ATI discriminated against Mr. Malamatis when it held him to performance standards to which younger workers were not similarly held.

141.   ATI discriminated against Mr. Malamatis when it uniquely subjected him to the PIP for violating performance standards and regimens not imposed upon younger workers, particularly amorphous, ill-defined and intentionally subjective standards and regimens which were designed to mask in an attempt to manufacture pretextual transgressions leading to termination.

142.   ATI discriminated against Mr. Malamatis when it denied Mr. Malamatis bonuses and promotions on the basis of ostensible standards applied in a disparate manner because of his age.

143.   ATI discriminated against Mr. Malamatis when it terminated Mr. Malamatis on the basis of ostensible standards applied in a disparate manner because of his age.

144.   ATI discriminated against Mr. Malamatis when it applied the terms of its Employee Handbook in a disparate manner, denying to Mr. Malamatis the courtesy of seriously considering and investigating his charges of age discrimination.

145.   Mr. Malamatis' age played a role in employer's decision making process and had a determinative influence on the outcome of this termination.

146.   ATI's stated and forthcoming reasons for disciplining and terminating Mr. Malamatis are pretextual.

147.   Mr. Malamatis has suffered damages as a result of ATI's unlawful actions.

148.   For ATI's  unlawful discrimination against Mr. Malamatis in violation of the ADEA, Mr. Malamatis is entitled to such legal or equitable relief as will effectuate the purposes of the ADEA including but not limited to reinstatement, economic damages, and reasonable costs and attorneys' fees.

**WHEREFORE**, Mr. Malamatis seeks judgment against ATI in an amount that exceeds SEVENTY-FIVE THOUSAND DOLLARS ($75,000) pursuant to this Count.  Such damages include economic and non-economic damages, punitive damages, plus costs, pre- and post-judgment interest as each may be entitled.

## COUNT II: ADEA RETALIATION AGE DISCRIMINATION IN EMPLOYMENT ACT, 29 U.S.C. §621, et seq.

149.   Mr. Malamatis incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

150.   Mr. Malamatis engaged in protected activity under the ADEA when Mr. Malamatis opposed age discrimination.

151.   Mr. Malamatis reported the age discrimination to his supervisors, Mr. Cooper and Ms. Amin,  in a good faith belief that he was being discriminated against due to his age, and in accordance with the edicts of the Handbook which required him to so report such discrimination.

152.   ATI violated the ADEA when it retaliated against Mr. Malamatis because of his complaints.

153.   ATI violated the ADEA specifically when, as a result of these complaints, it escalated the hostility in the workforce, ignored these complaints despite the requirement that it take action within its own Employee Handbook to seriously consider them, when it reacted by subjecting Mr. Malamatis to standards not applicable to other younger employees, when it subjected Mr. Malamatis to a PIP to which younger employees were not subjected, when it disproportionally imposed oversight over Mr. Malamatis in order to "ride" him "hard", and when it terminated Mr. Malamatis under false and manufactured pretexts.

154.   ATI's stated and forthcoming reasons for Mr. Malamatis' termination are pretextual.

155.   Mr. Malamatis suffered damages as a result of ATI's unlawful actions.

156.   For ATI's unlawful retaliation against Mr. Malamatis in violation of the ADEA, Mr. Malamatis is entitled to such legal or equitable relief as will effectuate the purposes of the ADEA including but not limited to reinstatement, economic damages, and reasonable costs and attorneys' fees.

**WHEREFORE**, Mr. Malamatis seeks judgment against ATI in an amount that exceeds SEVENTY-FIVE THOUSAND DOLLARS ($75,000) pursuant to this Count.  Such damages include economic and non-economic damages, punitive damages, plus costs, pre- and post-judgment interest as each may be entitled.

**COUNT III:  VIOLATION OF THE STATE OF MARYLAND'S ANTI-DISCRIMINATION PROVISIONS AS THEY PERTAIN TO AGE DISCRIMINATION (STATE GOVERNMENT ARTICLE, TITLE 20).**

157.   The preceding allegations are incorporated within this count, paragraph-by-paragraph, as if fully set forth herein.

158.   As set forth in MD State Govt Code §20-602 and elsewhere in the Code, the State of Maryland, in the exercise of its police power for the protection of the general welfare, seeks to assure all persons equal opportunity in receiving employment regardless of sex, sexual orientation, and to that end, seeks to prohibit discrimination in employment.

159.   This policy is not new; in fact, prior to 2011 the Maryland Code also provided (as it currently provides) that an employee may not be discharged (or discriminated against) in retaliation for opposing a discriminatory employment practice (See, former Md. Ann. Code Art. 49B, §§15, 16(f)).

160.   ATI is an "Employer" subject to  the State Government Article, Title 20, Subtitle 6, which prohibits discrimination in Employment.

161.   Section 20-606 of the State Government Title makes it unlawful for ATI to discharge, or otherwise discriminate against any individual with respect to an individual's compensation, terms, conditions, or privileges of employment because of that individual's age.

162.   Section 20-606 makes it unlawful for ATI to classify its employees in any way that would deprive or tend to deprive them of employment opportunities or otherwise adversely affect the individual's status as an employee because of the individual's age,

163.   When ATI made and encouraged to be made disparaging remarks about Mr. Malamatis' age, ATI violated the anti-discriminatory policies and statutes of Maryland.

164.   When ATI refused to take actions against the disparaging remarks about Mr. Malamatis' age, ATI violated the anti-discriminatory policies and statutes of Maryland.

26

165.   When ATI punished Mr. Malamatis for speaking out against  the disparaging remarks about Mr. Malamatis' age which made and promoted by his direct superior – for example, by subjecting him to a PIP and ultimately terminating him -- ATI violated the anti-discriminatory policies and statutes of Maryland.

166.   When ATI subjected Mr. Malamatis to adherence to a PIP it knew was unlawful for filing a complaint against his employer for making disparaging remarks about Mr. Malamatis' age, for creating a hostile work environment and for imposing disproportionate and punitive standards upon him, ATI violated the anti-discriminatory policies and statutes of Maryland.

167.   When ATI terminated Mr. Malamatis, for filing a complaint against  his employer for disparaging remarks about Mr. Malamatis' age and took other retaliatory actions as set forth herein, ATI violated the anti-discrimination policies and statutes of Maryland.

168.   Mr. Malamatis is entitled to damages for violation of the State of Maryland's counterpart to the federal anti-discrimination statutes.

**WHEREFORE**, Mr. Malamatis seeks judgment against ATI in an amount that exceeds SEVENTY-FIVE THOUSAND DOLLARS ($75,000) pursuant to this Count.  Such damages include economic and non-economic damages, punitive damages, plus costs, pre- and post-judgment interest as each may be entitled.

**COUNT IV:  VIOLATION OF THE STATE OF MARYLAND'S ANTI-RETALIATION PROVISIONS AS THEY PERTAIN TO AGE DISCRIMINATION (STATE GOVERNMENT ARTICLE, TITLE 20).**

169.   The preceding allegations are incorporated within this count, paragraph-by-paragraph, as if fully set forth herein.

170.   As set forth in MD State Govt Code §20-602 and elsewhere it is a policy of the State of Maryland, in the exercise of its police power for the protection of the general welfare, to assure all persons equal opportunity in receiving employment regardless of sex, sexual orientation, and to that end, to prohibit discrimination in employment by any person.

171.   In addition to proscribing the unlawful and discriminatory practices outlined in Count III above, §20-606  makes it unlawful for ATI to *retaliate* against its employees because the individual has opposed any practice prohibited by this subtitle; or made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subtitle.

172.   Maryland's Labor and Employment Article, Title 3, pertaining to Employment Standards and Conditions, also prohibits these retaliatory actions.

173.   Pursuant to §3-912, an employer may not discriminate in any manner or take adverse action against an individual because the individual, *inter alia,* files a complaint with the employer or the Commissioner alleging that the employer violated any provision of that subtitle or any regulation thereunder, and

28

174.   Section 3-308. also provides an employee may not be discharged (or discriminated against) in retaliation for making a complaint with his or her employer or another person.

175.   When ATI made and encouraged to be made disparaging remarks about Mr. Malamatis' age, ATI violated the anti-retaliatory policies and statutes of Maryland.

176.   When ATI refused to take actions against the disparaging remarks about Mr. Malamatis' age, ATI violated the anti-retaliatory policies and statutes of Maryland.

177.   When ATI punished Mr. Malamatis for speaking out against  the disparaging remarks about Mr. Malamatis' age  made and promoted by his direct superior – for example, by subjecting him to a PIP and ultimately terminating him -- ATI violated the anti-retaliatory policies and statutes of Maryland.

178.   When ATI subjected Mr. Malamatis to adherence to a PIP it knew was unlawful, for filing a complaint against  his boss and others for disparaging remarks about Mr. Malamatis' age, ATI violated the anti-retaliatory policies and statutes of Maryland.

179.   When ATI terminated Mr. Malamatis, for filing a complaint against  his boss and others for disparaging remarks about Mr. Malamatis' age, ATI violated the anti-retaliatory policies and statutes of Maryland.

180.   Mr. Malamatis is entitled to damages for violation of the State of Maryland's counterpart to the federal anti-discrimination statutes.

**WHEREFORE**, Mr. Malamatis seeks judgment against ATI in an amount that exceeds SEVENTY-FIVE THOUSAND DOLLARS ($75,000) pursuant to this Count.  Such damages include economic and non-economic damages, punitive damages, plus costs, pre- and post-judgment interest as each may be entitled.

## COUNT V:  BREACH OF CONTRACT (PROMISSORY ESTOPPEL) – FAILURE TO ABIDE BY TERMS OF THE WHISTLEBLOWER PROTECTIONS

181.   The preceding allegations are incorporated within this count, paragraph-by-paragraph, as if fully set forth herein.

182.   In its Employee Handbook, ATI made, repeated and reinforced various promises it made to Mr. Malamatis as an inducement for him to continue to work with ATI, to continue to generate business for ATI and to encourage his good faith complaints of age discrimination.

183.   When making these promises assiduously, ATI did so expecting Mr. Malamatis to rely upon them.

184.   Chief among these commitment made was the promise that, if Mr. Malamatis fulfilled his duty of reporting discrimination and harassment, ATI would never retaliate.

185.   As set forth *supra*, ATI indeed also imposed an immutable duty upon Mr. Malamatis to report instances of discrimination or harassment.

186.   And ATI vowed to protect whistleblowers by agreeing "not to retaliate against any person for making a good faith complaint under this policy …."

187.   Ironically, ATI also required Mr. Malamatis to report retaliation under pain of termination.

188.   But when Mr. Malamatis reported discrimination, harassment and retaliation to his employer, for example, by telling Mr. Mr. Cooper to cease his references to memory loss or age, Mr. Malamatis was retaliated against in violation of these promises.

189.   At the direction of Mr. Cooper and Ms. Amin, ATI retaliated against Mr. Malamatis by imposing upon him a degree of intensive oversight not applicable to younger employees, by  "riding" him "hard" when younger employees were not ridden hard, by holding him accountable to inequitable and double standards on account of his age, by haranguing him with an extensive list of made-up foibles and by raising the bar for his performance reviews as a pretext for termination, by uniquely subjecting him to a "growth plan" purposefully subjective and perfunctory in nature, by denying him access to his personnel records, by terminating Mr. Malamatis, and as a final act of vindictiveness, by failing to offer him a severance offered to other employees.

190.   No terms of the Employee Handbook claimed that the Whistleblower protections were illusory, rather than binding; nor did ATI ever inform its employees that the whistleblower protections were merely wishful.

191.   On the contrary, ATI sought to reinforce the integrity of these protections as a benefit of the enterprise.

192.   In order to reinforce the trust employees placed in their Employee Handbook, ATI stated that the Handbook will "answer many of the questions you may have as an employee," that "ATI strongly believe[s] in ensuring that our employees understand the policies of our workplace," and that "[the] employee handbook … does provide … important information about your benefits [and] responsibilities…."

193.   And while ATI did say that the "[E]mployee [H]andbook is … not to be considered a contract," what it clearly meant by this was that it did not seek to convert the at-will status of its employees into contractual or at-cause employees.

194.   As ATI clarified, in the "interest of clarity [it follows] it is important for you to understand that this [H]andbook is not a guarantee of employment with our Company for any definite or specific period of time and that you are employed at-will, unless agreed in writing…."

195.   To add additional clarity on the limitation, the acknowledgement section of the Handbook provides that the Handbook was not intended to confer rights upon

the employee as other than an at-will employee (stating "additionally, the contents of this handbook do not constitute an express or implied contract of employment).

196.   ATI employed no similar language to disavow its allegiance to the whistleblower provisions to which it considered itself and its employees bound.

**WHEREFORE**, Mr. Malamatis seeks judgment against ATI in an amount that exceeds SEVENTY-FIVE THOUSAND DOLLARS ($75,000) pursuant to this Count.  Such damages include economic and non-economic damages, punitive damages, plus costs, pre- and post-judgment interest as each may be entitled.

## COUNT VI:  INTENTIONAL MISREPRESENTATION

197.   The preceding allegations are incorporated within this count, paragraph-by-paragraph, as if fully set forth herein, particularly those allegations set forth in Count V.

198.   As stated supra, through its Employee Handbook, ATI made, repeated and reinforced various promises it made to Mr. Malamatis as an inducement for him to continue to work with ATI, to continue to generate business for ATI and to encourage his good faith complaints of age discrimination with the expectation that Mr. Malamatis would  rely upon them.

199.   Chief among these commitments made was the promise that, if Mr. Malamatis fulfilled his duty of reporting discrimination and harassment, ATI would not retaliate against him.

200.   As alleged supra, ATI stated emphatically that it would "not … retaliate against any person for making a good faith complaint under this policy …."

201.   ATI made other promises in an attempt to market itself as a "Great Place to Work®."

202.   ATI promised Mr. Malamatis it would not discriminate against him.

203.   ATI promised Mr. Malamatis it would take charges of discrimination or retaliation against his superiors seriously.

204.   ATI promised Mr. Malamatis that he would continue his employment with ATI is he satisfied the elements of the PIP.

205.   On the day he was terminated, ATI promised Mr. Malamatis they were merely calling him into the office to discuss his business plan as prelude for continuing employment.

206.   All these claims were false and intentional misrepresentations.

207.   The falsity of these claims was known to ATI,.

208.   ATI made misrepresentations with such reckless indifference to their truth.

209.   In fact, ATI made these misrepresentations for the purpose of defrauding Mr. Malamatis and other candidates for employment.

210.   Mr. Malamatis relied upon ATI's promises (and had a right to so rely upon them) when he reported discrimination and retaliation.

211.   Had he not relied upon these representations, Mr. Malamatis would not have worked for ATI, would not have complained of discrimination and would not have had to file this lawsuit as a consequence thereof.

212.   Mr. Malamatis suffered damage directly resulting from the misrepresentations that ATI would comply with the promises it made in the Employee Handbook, particularly those promises that it would comply with Federal and state law under Titles VII and state counterparts if Mr. Malamatis fulfilled his "responsibility" to report discriminatory practices..

   **WHEREFORE**, Mr. Malamatis seeks judgment against ATI in an amount that exceeds SEVENTY-FIVE THOUSAND DOLLARS ($75,000) pursuant to this Count.  Such damages include economic and non-economic damages, punitive damages, plus costs, pre- and post-judgment interest as each may be entitled.

**COUNT VII:  NEGLIGENT MISREPRESENTATION**

213.   The preceding allegations are incorporated within this count, paragraph-by-paragraph, as if fully set forth herein, particularly those allegations set forth in Count V and VI.

214.   ATI owed a duty of care to Mr. Malamatis as his employer.

215.   ATI negligently asserted various false statements, intending them  to be acted upon by Ms. Malamatis; including those set forth in Count VI.

216.   Chief among these were the commitments ATI made to Mr. Malamatis that, if Mr. Malamatis fulfilled his duty of reporting discrimination and harassment, ATI would not retaliate against him.

217.   ATI knew Mr. Malamatis will probably rely on that statement, which, if erroneous, would cause him to criticize his superior and ultimately cause loss or injury.

218.   In reliance on these false assertions, Mr. Malamatis justifiably took action by accepting ATI's employment offer, by remaining in ATI's employ,  by reporting discrimination and retaliation, and by being terminated as a result therefore.

219.   Mr. Malamatis, in taking such actions, suffered economic and non-economic damages proximately caused by the ATI's negligent assertions.

**WHEREFORE**, Mr. Malamatis seeks judgment against ATI in an amount that exceeds SEVENTY-FIVE THOUSAND DOLLARS ($75,000) pursuant to this Count.  Such damages include economic and non-economic damages, punitive damages, plus costs, pre- and post-judgment interest as each may be entitled.

## COUNT VIII:  CONSTRUCTIVE FRAUD

220.   The preceding allegations are incorporated within this count, paragraph-by-paragraph, as if fully set forth herein, particularly those allegations set forth in Count V through VII.

221.    Maryland Court have defined constructive fraud as a "breach of a legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests."

222.    When promising not to retaliate against Mr. Malamatis for complaining of age discrimination and of retaliation, and then doing so, ATI breached its legal duty to Mr. Malamatis.

223.    ATI employs many thousands of workers in Maryland.

224.    By publishing its Employee Handbook falsehoods to which it never intended to abide in order to falsely lure those workers to employment with its firm, ATI violated the public confidence as well as private confidence, and injured the public interest.

**WHEREFORE,** Mr. Malamatis seeks judgment against ATI in an amount that exceeds SEVENTY-FIVE THOUSAND DOLLARS ($75,000) pursuant to this Count.  Such damages include economic and non-economic damages, punitive damages, plus costs, pre- and post-judgment interest as each may be entitled.

**COUNT IX:  FRAUD IN THE CONCEALMENT**

225.   The preceding allegations are incorporated within this count, paragraph-by-paragraph, as if fully set forth herein, particularly those allegations set forth in Count V through VIII.

226.   Under Maryland law, concealment may amount to fraud where it is effected by misleading and deceptive talk, acts, or conduct, or is accompanied by misrepresentations, or where, in addition to a party's silence, there is any statement, word, or act on his part, which tends affirmatively to the suppression of the truth, or to a covering up or disguising of the truth, or to a withdrawal or distraction of a party's attention from the real facts.

227.   By affirmatively stating various promises with the intent that Mr. Malamatis rely upon them, ATI engaged in misleading and deceptive talk, acts, accompanied by misrepresentations.

228.   By concealing from Mr. Malamatis the truth that ATI never intended to honor its commitments, ATI intended to deceive Mr. Malamatis.

229.   By way of example, when Mr. Malamatis complained to Mr. Cooper about his references to age discrimination, Mr. Cooper concealed from Mr. Malamatis the fact that he would not investigate the complaint, would not consider it seriously, and would not retaliate against Mr. Malamatis.

230.   Because of the concealment of the truth, ATI caused damages to Mr. Malamatis who detrimentally and reasonably relied upon false assurances of ATI

that it would abide by the nondiscrimination and anti-retaliatory provisions of its Employee Handbook.

**WHEREFORE,** Mr. Malamatis seeks judgment against ATI in an amount that exceeds SEVENTY-FIVE THOUSAND DOLLARS ($75,000) pursuant to this Count. Such damages include economic and non-economic damages, punitive damages, plus costs, pre- and post-judgment interest as each may be entitled.

## COUNT X:  DECLARATORY JUDGMENT RELIEF AS TO ARBITRATION

1. Mr. Malamatis realleges and incorporates by reference the above allegations, paragraph-by-paragraph, as if fully set forth herein.

2. Mr. Malamatis' preference is that the contractual and tort-based claims that have given rise to this dispute be heard before this court, there is a substantial likelihood that ATI will not agree, and file a Motion to compel arbitration.

3. As a result, an actual controversy exists between contending parties.

4. ATI can be expected to argue that the Employee Handbook seeks to mandate arbitration for "Employees," and wish to ensure that the case is brought in a favorable arbitration forum.

5. As a consequence, ATI will likely seek to require Mr. Malamatis to arbitrate under Courts and Judicial Proceedings Article, § 3-207 with the usual platitudes about arbitration.

6.     However, Mr. Malamatis argues in the alternative three positions.

7.     First, that if ATI bound itself to an arbitral process at all, it did so only with respect to Employees, and this arbitration agreement, if such existed, only applied during the time Mr. Malamatis was engaged.  The "Agreement" refers exclusively to Employees and contains no survival clause.

8.     Second, ATI's so-called "agreement" was illusory and lacking consideration, as ATI reserved for itself the right to "modify policies and procedures at any time."

9.     And finally, ATI  abjectly waived and rejected the process of arbitration, which should now estop them from seeking to enforce it or taking actions inconsistent with it.

10.    Mr. Malamatis clearly and unequivocally indicated to the Employer his willingness at the time of discharge to avail himself of the employee dispute resolution processes as set forth in the Employee Handbook; however, ATI ignored its purported dispute resolution process.

11.    Moreover, instead of simply filing to initiate the arbitration process, the Defendant utterly short-circuited this process by terminating Mr. Malamatis from her position, rendering the so-called mandatory "open door" stage where the employees are encouraged to share their problems and concerns with their supervisors into a summary termination stage.

12.    By ignoring the Dispute Resolution Process, the Employer has waived its reliance on arbitration.

13.    Antagonistic claims are present between the parties involved which gave rise to this litigation; moreover, Mr. Malamatis is asserting a legal relation, status, right, or privilege that will be challenged or denied by ATI (*to wit*, they will assert they are entitled to arbitration).

14.    A party may obtain a declaratory judgment or decree notwithstanding a concurrent common-law, equitable, or extraordinary legal remedy, whether or not recognized or regulated by statute.

15.    Maryland Courts and Judicial Proceedings Article, § 3-409 empowers this court to issue a declaratory judgment or decree that resolves the issue over whether or not arbitration is required.

16.    Pursuant to this statute, this court may grant a declaratory judgment or decree that terminates this uncertainty within the proceeding.

**WHEREFORE,** Mr. Malamatis prays for the following relief:

A.    That if a Motion is made to Compel Arbitration, the court require the parties to brief and argue the issues concerning Declaratory Judgement;

B.      That upon such Motion and briefing, this court determines that the Employer waived the Arbitration clause or is otherwise not entitled to enforce it, that the court set this matter for trial.

C.      That should this court require arbitration, pursuant to the Courts and Judicial Proceedings Article §3-208, that this court stay this action, pending the outcome of the arbitration proceedings to be filed before the American Arbitration Association within a reasonable period of time from the docketing of the Order and any resolution of Motions to Reconsider.

## VI.  PRAYER FOR RELIEF

Plaintiff Prays for judgment against ATI in an amount that exceeds SEVENTY FIVE THOUSAND DOLLARS ($75,000) in the form of: (a) non-economic damages caused by the mental distress and anguish experienced by Mr. Malamatis; (b) economic damages representing the loss of income, savings, fringe benefits and other remuneration to which he is entitled; (c) punitive damages, pre- and post-judgment interest as allowed by law, the costs of this suit and such other and further relief as this Honorable Court may deem just and proper.

## VII.  DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all claims hereunder that may be triable before a jury.

### RULE 20-201 (f)(1)(B) CERTIFICATE

I HEREBY CERTIFY that the foregoing does not contain any restricted information, or, if it does contain restricted information, a redacted submission has been filed contemporaneously pursuant to subsection (f)(2) of this Rule.

Respectfully submitted,


/S/ *Dan R. Mastromarco*

———————————————

DAN R. MASTROMARCO
Fed. MD Bar ID 18243
MD CPF ID: 0901140002
THE MASTROMARCO FIRM, LLP
703 Giddings Avenue, U5
Annapolis, MD 21401
danmastromarco@gmail.com
410.349.1725 O
202.285.9097 C
410.268.1597 Fax