IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMES MALAMATIS
    *Plaintiff*,

    v.                         Civil Action No. ELH-21-2226

ATI HOLDINGS, LLC
    *Defendant*.

**MEMORANDUM OPINION**

This Memorandum Opinion concerns a motion to compel arbitration in an age discrimination suit lodged by plaintiff James Malamatis against his former employer, defendant ATI Holdings, LLC ("ATI").

On July 14, 2021, plaintiff filed a ten-count Complaint in the Circuit Court for Anne Arundel County. *See* ECF 1-3. Defendant removed the case to federal court on August 30, 2021, asserting federal question jurisdiction under 28 U.S.C. § 1331; diversity jurisdiction under 28 U.S.C. § 1332; and supplemental jurisdiction under 28 U.S.C. §§ 1367(a) and 1441(c). *See* ECF 1 (the "Notice"), ¶¶ 2, 3-7.[1] A First Amended Complaint followed on September 24, 2021. ECF 17.[2] Malamatis claims, among other things, that when he was an employee of ATI, he was subjected to discriminatory conduct because of his age and to retaliation based on his complaints about this treatment, which ultimately led to his termination and the denial of severance.

---

[1] In the initial Complaint, plaintiff erroneously named ATI Physical Therapy, Inc. as the defendant. ECF 1-3 at 1. But, according to the Notice, ATI Holdings, LLC, a wholly-owned subsidiary of ATI Physical Therapy, Inc., is the proper defendant. ECF 1, ¶ 6 n.2; *see* ECF 9 (Local Rule 103.3 Disclosure Statement).

[2] On September 24, 2021, Malamatis moved, with the consent of defendant, to amend the Complaint. ECF 14. I granted that Motion by Order of September 24, 2021. ECF 15.

In particular, the Amended Complaint contains ten claims against ATI, as follows: age discrimination, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* (Count I); retaliation, in violation of the ADEA (Count II); age discrimination, in violation of the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code (2021 Repl. Vol.), §§ 20-601 *et seq.* of the State Government Article (Count III); retaliation, in violation of MFEPA (Count IV); "Breach Of Contract (Promissory Estoppel)" (Count V); intentional misrepresentation (Count VI); negligent misrepresentation (Count VII); constructive fraud (Count VIII); fraud in the concealment (Count IX); and "Declaratory Judgment Relief As To Arbitration" (Count X).  ECF 17 at 21-41.

Malamatis has filed a "Motion For Clarification . . ." as to defendant's purportedly untimely removal of the case to federal court.  ECF 13 (the "Clarification Motion").  The Clarification Motion is supported by two exhibits.  ECF 13-1; ECF 13-2.  Defendant opposes the Clarification Motion.  ECF 18.  Plaintiff has not replied, and the time do so has expired.  *See* Local Rule 105.2(a).

ATI has filed a motion to compel arbitration and to dismiss the suit.  ECF 19.  It is supported by a memorandum of law (ECF 19-1) (collectively, the "Motion" or "Arbitration Motion") and one exhibit.  ECF 19-2.[3]  Plaintiff opposes the Motion (ECF 20), supported by two exhibits.  ECF 20-1; ECF 20-2.  And, defendant has replied.  ECF 21.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Clarification Motion and I shall grant the Arbitration Motion.

---

[3]  Defendant also moved to compel arbitration as to the Complaint.  *See* ECF 8.  "As a general rule, 'an amended pleading ordinarily supersedes the original and renders it of no legal effect.'"  *Young v. City of Mt. Ranier*, 238 F.3d 567, 572 (quoting *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir. 2000)).  Accordingly, I shall deny ECF 8, as moot.

I.        Clarification Motion

A.

Federal courts are courts of limited jurisdiction and "may not exercise jurisdiction absent a statutory basis." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). "A court is to presume, therefore, that a case lies outside its limited jurisdiction unless and until jurisdiction has been shown to be proper." *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008) (citing *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994)).

The "burden of establishing subject matter jurisdiction is on . . . the party asserting jurisdiction." *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010); *accord McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010). Thus, "[i]f a plaintiff files suit in state court and the defendant seeks to adjudicate the matter in federal court through removal, it is the defendant who carries the burden of alleging in his notice of removal and, if challenged, demonstrating the court's jurisdiction over the matter." *Strawn v. AT&T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008).

A federal court "should construe removal statutes narrowly, [with] any doubts . . . resolved in favor of state court jurisdiction." *Barbour v. Int'l, Union*, 640 F.3d 599, 617 (4th Cir. 2011) (en banc) (abrogated in part on other grounds by the Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112–63, 125 Stat. 758 (Dec. 7, 2011) ("JVCA")). The Fourth Circuit has said: "Because removal jurisdiction raises significant federalism concerns, we must strictly construe removal jurisdiction." *Mulcahey v. Columbia Organic Chemicals Co.*, 29 F.3d 148, 151 (4th Cir. 1994) (citing *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100 (1941)).

Under the general removal statute, 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction" may be "removed

by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."[4]  Notably, "[e]ach defendant shall have 30 days after receipt by or service on that defendant of the initial pleading or summons . . . to file the notice of removal."  *Id.* § 1446(b)(2)(B).

## B.

As noted, defendant removed the case to federal court on August 30, 2021.  ECF 1.  On August 31, 2021, the Court issued a "Standing Order Concerning Removal" (ECF 6, the "Standing Order"), which required that "all parties removing actions to this court, shall, no later than fourteen (14) days after filing a removal, file and serve a statement . . . ."  In the event that removal occurred more than thirty days after any defendant was first served, the statement must explain "the reasons why removal [took] place at this time and the date on which the defendant(s) was (were) first served with a paper identifying the basis for such removal."  ECF 6, ₱ 3.

On September 7, 2021, defendant timely filed a "Statement In Response To Standing Order On Removal".  ECF 10.  ATI stated: "Removal took place thirty (30) days after Defendant was first served."  *Id.* ₱ 3.  Thereafter, Malamatis filed the Clarification Motion.  ECF 13.

In the Clarification Motion, plaintiff asserts that ATI was served with a copy of the summons and the Complaint on July 30, 2021.  ECF 13, ₱ 1; *see* ECF 1, ₱ 1; *see also* ECF 1-4 at

---

[4] Title 28 U.S.C. § 1331 grants federal district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  When a case arises under this provision, it is removable without regard to the citizenship of the parties.  *See* 28 U.S.C. §§ 1441(a)–(b).  However, removal requires the consent of all defendants. 28 U.S.C. § 1446(b)(2)(A).  Under 28 U.S.C. § 1332(a)(1), federal district courts also have subject matter jurisdiction over "civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."  With exceptions not applicable here, diversity jurisdiction under § 1332 "requires complete diversity among parties, meaning that the citizenship of every plaintiff must be different from the citizenship of every defendant."  *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011).

4-5.  Malamatis claims that defendant did not remove the case to federal court until thirty-one days later, on August 30, 2021.  ECF 13, ⁋ 1; *see* ECF 1.  Therefore, plaintiff asks the Court to require ATI to explain why it removed the suit to federal court "more than thirty (30) days after original service."  ECF 13, ⁋ 1; *see id.* at 2.

In response (ECF 18), defendant notes that service was effected on July 30, 2021, and August 29, 2021, was the thirtieth day.  But, that date fell on a Sunday.  *Id.* ⁋ 4.  In such circumstances, the federal rules provide that the applicable filing period "continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday."  Fed. R. Civ. P. 6(a)(1)(C).

Accordingly, the relevant time period for plaintiff to remove the suit to federal court was extended to Monday, August 30, 2021.  It follows that defendant timely removed the case to federal court.  *See* ECF 1.  Therefore, I shall deny the Clarification Motion.

## II.      The Arbitration Motion

### A.  Factual Background

#### 1.

Malamatis was employed by ATI from March 2018 until September 6, 2019.  ECF 17, ⁋ 15.[5]  Notably, "ATI operates approximately 860 clinics across more than 24 states within the U.S. and offers physical therapy services and specialty therapies, some of which are in Maryland."  *Id.* ⁋ 5.

As an employee of ATI, plaintiff "worked as a 'Practice Partner/Sales Consultant' for the region commonly known as 'Baltimore West', which encompassed several counties within

---

[5] The parties do not specify the exact date on which plaintiff began employment with ATI.  But, exhibits appended to the Motion reflect that plaintiff executed an arbitration agreement on March 9, 2018.  *See* ECF 19-2 at 9.  Defendant indicates, and plaintiff does not dispute, that the document was executed "as part of the onboarding process for [plaintiff's] employment and a condition of his employment . . . ."  ECF 19-1 at 1.

Maryland and parts of Baltimore City." ECF 17, ¶ 24. In this role, he "was in essence an old-fashioned salesman for ATI, whose primary responsibility was generating referrals," and he "worked to introduce providers (most orthopedic surgeons) to the ATI facilities network." *Id.* ¶¶ 25, 26. He was primarily evaluated based on his "ability to obtain referrals from the medical providers, and his bonus was determined on that basis." *Id.* ¶ 27.

According to the Amended Complaint, "Malamatis came to work with ATI after an inveterate and successful career within the orthopedic profession," specifically with more than fifteen years' experience in "orthopedic and neurosurgery sales." *Id.* ¶ 28. At the time plaintiff began his employment with ATI, he was sixty-four years of age. *Id.* ¶ 29. "[T]his made him the oldest employee in a team of employees where the average years-of-age was, upon information and belief, about 25." *Id.* Indeed, plaintiff asserts: "No workers had attained Mr. Malamatis' age, and only a handful were over the age of 55." *Id.* ¶ 30.

In seeking a position with ATI, plaintiff "had hoped that that position would be his last, continuing his career's work in the medical sales field over the course of decades." *Id.* ¶ 31. "When seeking the position, Mr. Malamatis made that fact known to ATI." *Id.* ¶ 32. During plaintiff's employment with ATI, he proved, "by virtually all metrics," to be "an extraordinarily well-performing employee who consistently contributed to ATI's bottom line." *Id.* ¶ 34. According to the Amended Complaint, "Mr. Malamatis's sale results were superior to other employees." *Id.* ¶ 36. And, "[a]s one of the top performers in ATI, he was praised by management . . . ." *Id.* ¶ 35.

Nonetheless, plaintiff claims that, "[f]rom the date of his engagement with ATI in March of 2018 until his wrongful termination on September 6, 2019, [he] endured a systematic, relentless and escalating campaign of harassment as the oldest worker in his department." *Id.* ¶ 15. He

states: "At the hands of his direct superiors, Mr. Charlton Cooper ('Mr. Cooper') and Ms. Priya Amin [(]'Ms. Amin'), ATI's campaign of harassment against Mr. Malamatis began with the assertion and condonement of disparaging and hostile remarks about his age and memory." ECF 17, ꝑ 16.   Further, plaintiff claims that Amin directed Cooper to "'ride' Mr. Malamatis 'hard,' which implied disparate treatment." *Id.* ꝑ 17.

When plaintiff "complained of the degrading remarks, and demand[ed] that they cease, ATI retaliated against him through other means." *Id.* ꝑ 18. In particular, Malamatis alleges that "Ms. Amin subjected [him] to job performance standards uniquely applicable to him, gave Mr. Cooper a directive to single Mr. Malamatis out for aggressive oversight, placed Mr. Malamatis on a Performance Improvement Plan . . . with ill-defined and subjective standards, denied Mr. Malamatis bonuses and then ultimately terminated him—without so much as bothering to assess him against the amorphous standards she and Mr. Cooper ostensibly imposed as a basis for evaluating his performance." *Id.* ꝑ 19.   Further, "[a]s a result of seeking to utilizing [sic] the avenues available to him in an attempt to stop this harassment, employees of ATI, then retaliated against Mr. Malamatis further by failing to offer him any severance normally offered to younger employees." *Id.* ꝑ 20.

Malamatis asserts: "The harassment and termination of Mr. Malamatis was wrongful and abusive, designed to disparage Mr. Malamatis before he [sic] peers and colleagues, defame him, and tarnish his reputation with clients, professional associates and the industry to which he devoted his career." *Id.* ꝑ 21.[6]   Further, he indicates: "When engaging in this retaliation, ATI knew Mr.

---

[6] Additional details concerning the discriminatory treatment to which plaintiff was allegedly subjected while an employee of ATI are included in paragraphs 23 through 133 of the Amended Complaint.  However, I do not recount them here, as they are not directly pertinent to the resolution of the Motion.

Malamatis was intending to vindicate his right by filing an EEOC complaint which he ultimately did." ECF 17, ⁋ 22.

## 2.

ATI asserts that, "[u]pon hire, Plaintiff agreed to arbitrate any disputes arising from his employment with ATI." ECF 19-1 at 3. Further, as a condition of plaintiff's employment, he executed an "Arbitration Agreement." *Id.* at 1; *see* ECF 19-2 at 5-7 (the "Arbitration Agreement").[7] According to the Declaration of Jane Cobler, ATI's Vice President of Human Resources, the Arbitration Agreement submitted as an exhibit is a "true and accurate copy of the Arbitration Agreement that is included in ATI's personnel records pertaining to Mr. Malamatis . . . ." ECF 19-2 at 2 (the "Cobler Declaration"), ⁋ 5. Further, she avers: "A true and accurate copy of Mr. Malamatis's electronic signature from March 9, 2018 . . . is attached [to the Motion]." *Id.* at 3, ⁋ 6; *see id.* at 9 (the "Screenshot").

Several provisions of the Arbitration Agreement are relevant. The Arbitration Agreement includes a clause titled "**Arbitration of Disputes**". *Id.* at 5 (bold in original). In short, it provides that, with exceptions not relevant here, disputes between Malamatis and ATI are subject to arbitration. *Id.* The clause states, in part *id.*:

> Both Employee and ATI Holdings, LLC and Athletic & Therapeutic Institute of Naperville, LLC (hereinafter "ATI") acknowledge that ATI promotes a system of alternative dispute resolution that involves binding arbitration to resolve all disputes that may arise between them in the employment context. . . . [B]oth ATI and the Employee agree that any claim, dispute, and/or controversy that either the Employee or ATI may have against the other shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act, in conformity with the procedures of the Illinois Revised Statutes Chapter 710, ILCS § 5 et seq. The terms "claim, dispute and/or controversy" include, but are not limited to, any claims of discrimination and harassment, whether they be based on the Illinois Human Rights Act, Title VII of the Civil Rights Act of 1964, as amended, as well as all other state or federal laws or regulations. These terms also

---

[7] ECF 19-2 contains multiple exhibits.

include without limitation any claim, dispute, or controversy, including class action claims, which would otherwise require or allow resort to any court or other governmental dispute resolution forum arising from, related to, or having any relationship or connection whatsoever with Employee's seeking employment with, employment by, termination of employment, or other association with ATI, whether based on tort, contract, statutory, or equitable law, or otherwise. . . .

Further, the Arbitration Agreement includes **"Rules of Arbitration"**, *id.*, and delineates a five-step process for "**Pre-Arbitration Dispute Resolution**", in which an ATI employee must engage before initiating arbitration, as follows, ECF 19-2 at 5-6:

STEP 1:     Before filing a complaint to initiate arbitration, the Employee will discuss the matter informally with his immediate supervisor or, if the immediate supervisor is perceived to be at fault, the Employee may move immediately to STEP 2.

STEP 2:     If STEP 1 does not solve the problem, the Employee will file a written complaint with the Vice President, Human Resources within **28 days** after the event or problem occurred. At the Employee's request, the Vice President, Human Resources may assist the Employee in preparing his complaint.

STEP 3:     The Vice President, Human Resources will conduct an investigation concerning the Employee's written complaint within **14 days** after filing.

STEP 4:     The Vice President, Human Resources will issue a written decision to the Employee within **14 days** after the close of the investigation and hearing.

STEP 5:     **ARBITRATION**. If the Employee is not satisfied with the Vice President, Human Resources written decision in STEP 4, or the Vice President, Human Resources fails to respond within 28 days, the Employee may submit his complaint to be heard by an independent arbitrator.

To institute arbitration, the Arbitration Agreement provides that a "request must be submitted in writing to the Vice President, Human Resources within **90 days** after the date of the written decision in STEP 4, or within 90 days of the expiration of the deadline for such decision, except where federal and/or state law prescribe a longer period of time in which to file a

complaint." ECF 19-2 at 6. Thereafter, "[t]he Employee's complaint will be submitted to and resolved through mutually binding arbitration administered by the American Arbitration Association ('AAA') or another agency if ATI and the Employee so agree." *Id.* Further, the Arbitration Agreement specifies: "The AAA's 'Rules for Employee Dispute Resolution' will be used in any arbitration proceeding." *Id.* It also indicates that a copy of these rules is available "from the Vice President, Human Resources or on AAA's web site at www.adr.org." *Id.*

ATI appended to the Motion a copy of the "Employment Arbitration Rules and Mediation Procedures." *See id.* at 11-46 (the "AAA Rules"). AAA Rule 6 is tilted "Jurisdiction". *Id.* at 22. It states, in relevant part, *id.*: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."

Another provision in the Arbitration Agreement is titled "**Waiver of Jury Trial**". *Id.* at 7. It provides, *id.* (boldface omitted): "EMPLOYEE AND ATI UNDERSTAND THAT BY VOLUNTARILY AGREEING TO THIS BINDING ARBITRATION PROVISION, BOTH GIVE UP THEIR RIGHT TO TRIAL BY JURY OF ANY CLAIMS SUBJECT TO ARBITRATION UNDER THIS AGREEMENT THAT EITHER MAY HAVE AGAINST EACH OTHER."

Moreover, the Arbitration Agreement includes a provision entitled "**Exclusive Agreement**". *Id.* It states, *id:* (underling in original):

> It is further agreed and understood that any agreement contrary to the foregoing must be entered into, in writing, by the Vice President of Human Resources for ATI. No supervisor or representative of ATI, other than the Vice President of Human Resources for ATI, has any authority to enter into any agreement contrary to the foregoing arbitration provisions. <u>Oral representations made before or after Employee is hired do not alter this agreement.</u>

And, the Arbitration Agreement contains a provision entitled "**Entire Agreement**".  ECF 19-2 at 7.  It states, *id.*: "This is the entire agreement between ATI and Employee regarding dispute resolution and this agreement supersedes and [sic] all prior agreements regarding this issue."

ATI asserts that plaintiff executed the Arbitration Agreement "as part of the onboarding process. . . ."  ECF 19-1 at 1; *see id.* at 3.  Cobler avers that plaintiff "was presented with the Arbitration Agreement and, upon logging in to ATI's Dayforce system with a unique employee number and password, reviewed the text of the Arbitration Agreement and electronically accepted and acknowledged that he read and understood that he was legally bound by the Arbitration Agreement."  ECF 19-2 at 3, ¶ 6.  Notably, Cobler also avers that plaintiff "had the opportunity to 'opt-out' of the Arbitration Agreement but declined to do so."  *Id.*

As mentioned, on March 9, 2018, plaintiff executed the Arbitration Agreement electronically.  *Id.* at 9.  The Screenshot reflects that he "accept[ed] and acknowledge[d] the company policy above".  *Id.*  The following text appears in the Screenshot, *id.*:

> I have been provided a copy of the Arbitration Agreement and have decided by my acknowledgement below that I have read, understand, and am legally bound by the attached agreement.  If I choose to opt-out of the "Arbitration Agreement" I must indicate in the comment section below my desire to opt-out.
> I understand that I may not opt-out of the arbitration provisions of the "Arbitration Agreement" while I have any legal claim pending which arose prior to my execution of this form and which has been or could have been submitted to arbitration under the "Arbitration Agreement" at the time the claim arose.

Plaintiff did not include any "comment" in the section provided.  *Id.*

According to plaintiff (ECF 20 at 7-10, 19-29), another document, ATI's "Employee Handbook", is also relevant here.  *See* ECF 20-1 (the "Employee Handbook" or the "Handbook").  It is about 175 pages in length.  *Id.*

The first substantive section of the Handbook is titled "A Word about the Handbook".  *Id.* at 7-8.  It begins: "This employee handbook is effective **February 15, 2018,** and supersedes all

previous handbooks and existing policies and practices on the subjects addressed in this handbook." ECF 20-1 at 7. Further, it states: "Updates will be periodically added to this Handbook" and "ATI may modify policies and procedures at any time . . . ." *Id.*

Moreover, the Handbook provides: "As a starting point of employment with us, we request that you read this employee handbook. As an employee of ATI, you are expected to abide by our policies. You will be asked to sign an acknowledgment and certain specific policies that indicate you have received this handbook, that you understand our employment policies and requirements, and that you agree to abide by them. . . . We are committed to constantly reviewing all policies and benefits. Future amendments may be made, and will be communicated to you . . . ." *Id.*

Additionally, the Employee Handbook indicates: "[P]lease note that this employee handbook is provided as a guide and is not to be considered a contract. . . . [I]t is important for you to understand that this handbook is not a guarantee of employment with our Company for any definite or specific period of time and that you are employed at-will, unless agreed in writing otherwise with the Chief Human Resources Officer or the CEO." *Id.*[8]

The Handbook also provides: "The Company reserves the right to make changes to the policies, procedures, and other statements made in this employee handbook." *Id.* at 8. Further, it states, *id.*: "ATI retains the sole right in its business judgment to modify, suspend, interpret, or cancel, in whole or in part, at any time, with or without notice, any published or unpublished policy, practice, procedure, process, or benefit." And, the Handbook provides that ATI employees "are under no obligation to remain in the Company's employ for any specified period of time." *Id.*

---

[8] The Handbook refers to ATI and the "Company" interchangeably. *See* ECF 20-1 at 7-8.

Further, the Handbook includes a form titled: "Employee Handbook Acknowledgement Receipt" (the "Acknowledgement"). ECF 20-1 at 173. It states: "I have access to a copy of the ATI employee handbook through the online Company Self Service Portal. I understand I am to read and become familiar with the contents of the handbook and my particular state appendix as it outlines the Company's benefits, policies and my responsibilities." *Id.*[9] And, it indicates that, by executing the Acknowledgement, the employee indicates his or her understanding of and agreement with the following statement, *id.*:

> This handbook represents only a brief summary of some of the more important benefits, policies, practices, and procedures, including our confidentiality policy, FMLA policy and harassment policy and state appendixes. This handbook is not all inclusive. Additionally, the contents of this handbook do not constitute an express or implied contract of employment.
>
> Unless it has been agreed to in writing by either the CEO or the Chief Human Resources Officer, in the interest of clarity I am employed at-will, which means that I have the right to end my employment relationship with ATI, with or without advance notice or cause, and ATI has an identical right. The Company may also at any time in its discretion change or eliminate any policies or benefits. Similarly, I am under no obligation to remain in the Company's employ for any specific period of time.

The last section of the Employee Handbook is titled "Arbitration Agreement". *Id.* at 175-178. It consists of an agreement nearly identical to the one that plaintiff executed. *Compare id. with* ECF 19-2 at 5-7. At the bottom of the last page of the "Arbitration Agreement" contained within the Handbook, it states: "MY SIGNATURE BELOW ATTESTS TO THE FACT THAT I HAVE READ, UNDERSTAND, AND AGREE TO BE LEGALLY BOUND TO ALL OF THE ABOVE STATEMENTS." ECF 20-1 at 178 (boldface omitted). And, it provides a space for an employee's signature. *Id.* But, there is no indication that plaintiff signed the version of the

_____

[9] Although not directly pertinent to the resolution of the Motion, the Handbook also contains an appendix of State-specific policies relevant to employees located in Maryland. *See* ECF 20-1 at 117-20.

Arbitration Agreement contained within the Handbook.  In other words, the document merely appears to illustrate the employer's Arbitration Agreement.

Notably, in plaintiff's response to the Motion, he asserts that "all employment documents were provided simultaneously to employees.  Requiring them to acknowledge receipt of these documents was ATI's standard procedure."  ECF 20 at 26.   But, the record is devoid of any suggestion that Malamatis signed the Acknowledgment, or otherwise acknowledged his receipt of the Handbook.

**3.**

Plaintiff does not indicate whether he engaged in the pre-arbitration dispute resolution process outlined in the Arbitration Agreement, other than complaining to Mr. Cooper about the allegedly discriminatory treatment to which he had been subjected, as contemplated by Step 1.  *See* ECF 17, ¶¶ 18, 67; *see also* ECF 19-2 at 5-6 (outlining five-step pre-arbitration dispute resolution process).  In her  Declaration, Cobler asserts, in relevant part: "I have located no record of a written complaint by Mr. Malamatis to the Vice President of Human Resources as required under Step 2 of the Arbitration Agreement, or of any written request by Mr. Malamatis to the Vice President of Human Resources to submit a dispute to arbitration."  ECF 19-2 at 3, ¶ 7.  Plaintiff does not dispute these assertions.

Further, defendant contends that after plaintiff filed his Complaint in State court, "counsel for Defendant advised counsel for Plaintiff of the Arbitration Agreement that Plaintiff had signed as a condition of his employment and provided a copy of the Arbitration Agreement and signature thereto on July 22, 2021 requesting that Plaintiff consent to move this matter to arbitration[.]" ECF 19-1 at 4-5.  Nonetheless, "Plaintiff's counsel declined to provide his consent."  *Id.* at 5.  Thus, defendant asserts that plaintiff "has refused to voluntarily submit his claims to arbitration."  *Id.*

Moreover, plaintiff implies that he filed a Charge with the EEOC on some date after August 18, 2019. ECF 17, ⁋ 98. But, he has not provided the Court with a copy of such a Charge. Nor has he specified what action, if any, the EEOC took with respect to the Charge.

### A.  Legal Principles

#### 1.  Federal Arbitration Act

The Federal Arbitration Act ("FAA" or the "Act"), 9 U.S.C. §§ 1 *et seq.*, "requires courts to enforce covered arbitration agreements according to their terms." *Lamps Plus, Inc. v. Varela*,___U.S. ___, 139 S. Ct. 1407, 1412 (2019); *see also Mey v. DIRECTV, LLC*, 971 F.3d 284, 288 (4th Cir. 2020); *McCormick v. Am. Online, Inc.*, 909 F.3d 677, 679 (4th Cir. 2018). "Arbitration is a matter of contract." *Mey*, 909 F.3d at 288; *see Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288, 2022 WL 1207161, at *2 (4th Cir. Apr. 25, 2022).[10] Indeed, the FAA "places arbitration agreements on equal footing with all other contracts." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006). And, arbitration "has been given the imprimatur of the Supreme Court over the last decade." *Rowland v. Sandy Morris Fin. & Estate Planning Servs., LLC*, 993 F.3d 253, 257 (4th Cir. 2021) (citing *Henry Schein, Inc. v. Archer & White Sales, Inc.*, ___U.S.___, 139 S. Ct. 524 (2019); *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011)).

However, to enforce an arbitration agreement, the court "must be satisfied that a valid agreement exists." *Coady*, 2022 WL 1207161, at *2. And, "[t]he presumption favoring arbitration does not apply to this preliminary question of the Arbitration Agreement's validity." *Id.*; *see Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 302-03 (2010); *Rowland*, 993 F.3d at 257-58; *Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 611 n.6 (4th Cir. 2013). The matter of the

---

[10] As of this writing, the pin cite for this case is not yet available in F.4th.

validity of an arbitration agreement turns on "principles of contract formation and interpretation" under applicable state law. *Coady*, 2022 WL 1207161, at *2; *see Rota-McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 699 (4th Cir. 2012).

The FAA "establishes 'a liberal federal policy favoring arbitration agreements.'" *Epic Sys. Corp. v. Lewis*, ___U.S.___, 138 S. Ct. 1612, 1621 (2018) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *see also McCormick*, 909 F.3d at 680 ("[T]he FAA elevates the arbitration of claims as a favored alternative to litigation when the parties agree in writing to arbitration."). Under § 2 of the Act, an arbitration contract is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

Section 3 of the Act provides, 9 U.S.C. § 3:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

Thus, the Fourth Circuit has said: "The FAA requires a court to stay 'any suit or proceeding' pending arbitration of 'any issue referable to arbitration under an agreement in writing for such arbitration.' This stay-of-litigation provision is mandatory." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002) (quoting 9 U.S.C. § 3). Nevertheless, in lieu of a stay, some courts have determined that "dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001); *see Willcock v. My Goodness! Games, Inc.*, PWG-16-4020, 2018 WL 3970474, at *4 (D. Md. Aug. 20, 2018); *Kabba v. Rent-A-Ctr*, PWG-17-211, 2017 WL 1508829, at *2 (D. Md. Apr. 27, 2017) (same), *aff'd*, 730 F. App'x 141 (4th Cir. 2018) (per curiam).

Under 9 U.S.C. § 4, a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may petition a district court "for an order directing that such arbitration proceed in the manner provided for in such agreement." Further, § 4 provides that, when presented with such a petition, a court

> shall hear the parties, and upon being satisfied that the making of the agreement for arbitration . . . is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

Conversely, § 4 provides that if the "making of the arbitration agreement, or the failure, neglect, or refusal to perform the same be in issue," then "the court shall proceed summarily to the trial thereof."

"'Sections 3 and 4 [of the FAA] . . . provide two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4.'" *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 84 (4th Cir. 2016) (quoting *Chorley Enters. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 563 (4th Cir. 2015)) (brackets in *Galloway*).

The Fourth Circuit has identified the elements of an action to compel arbitration under the FAA. In *Galloway*, 819 F.3d at 84 (cleaned up) (citations omitted), it said:

> [A]pplication of the FAA requires demonstration of four elements: (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.

*See also Adkins*, 303 F.3d at 500-01; *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991). And, these requirements apply to motions to compel arbitration brought under § 3 as well as those brought under § 4 of the FAA. *See Noe v. City Nat'l Bank of W. Virginia*, 828 F. App'x 163, 165 (4th Cir. 2020) (per curiam) (citing *Adkins*, 303 F.3d at 500-01).

The *Adkins* Court has said, 303 F.3d at 500: "A district court . . . has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview." Accordingly, a court must "engage in a limited review to ensure that the dispute is arbitrable—*i.e.*, that a valid agreement exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Murray v. United Food & Commercial Workers Int'l Union*, 289 F.3d 297, 302 (4th Cir. 2002). However, the Supreme Court has said "that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability." *Henry Schein, Inc.*, 139 S. Ct. at 529 (internal quotation marks omitted).

As noted, "[w]hether a party has agreed to arbitrate an issue is a matter of contract interpretation: '[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Levin v. Alms and Assoc., Inc.*, 634 F.3d 260, 266 (4th Cir. 2011) (quoting *Am. Recovery Corp. v. Computerized Thermal Imaging*, 96 F.3d 88, 92 (4th Cir. 1996) (citation omitted)) (alteration in *Levin*); *see Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 236 (4th Cir. 2019); *Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 913 F.3d 409, 415 (4th Cir. 2019). And, "where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." *Granite Rock Co.*, 561 U.S. at 296; *see also Rowland*, 993 F.3d at 258 ("Section 4 of the FAA has made clear that it is up to the courts to determine whether a contract has been formed . . . . This respects party autonomy and the general principles of contract law."); *Berkeley Cty. Sch. Dist.*, 944 F.3d at 234 (stating that § 4 of the FAA "requires that the district court—rather than the arbitrator—decide whether the parties have formed an agreement to arbitrate"); *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 637 (4th Cir. 2002).

To determine if there is a valid agreement, courts in the Fourth Circuit "'apply ordinary state-law principles that govern the formation of contracts and the federal substantive law of arbitrability.'" *Minnieland Private Day Sch.*, 913 F.3d at 415 (citation omitted). But, "[a]ny uncertainty regarding the scope of arbitrable issues agreed to by the parties must be resolved in favor of arbitration." *Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 179 (4th Cir. 2013) (citations omitted); *see also Levin*, 634 F.3d at 266 ("The 'heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration.'"); *Adkins*, 303 F.3d at 500.

## 2.   Standard of Review

ATI maintains that, in the event the Court finds that its dispute with plaintiff is subject to arbitration, then the Court should dismiss the suit pursuant to Fed. R. Civ. P. 12(b)(3). *See* ECF 19-1 at 12-13.

The Supreme Court has observed that an arbitration clause is "a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974).  Indeed, in *Sucampo Pharmaceuticals, Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 550 (4th Cir. 2006), the Fourth Circuit determined that "a motion to dismiss based on a forum-selection clause," such as an arbitration provision, "should be properly treated under Rule 12(b)(3) as a motion to dismiss on the basis of improper venue." *See also Shaomin Sui v. FedEx Ground Package System, Inc.*, CCB-19-3318, 2020 WL 3639984, at *2 (D. Md. Jul. 6, 2020).  The *Sucampo* Court explained, 471 F.3d at 548 (internal and external citations omitted) (alteration added):

> [T]reating a motion to dismiss on the basis of a forum-selection clause under Rule 12(b)(1) presents practical difficulties that undercut the benefits gained from enforcement of the clauses.  For example, the court must raise the issue of subject-matter jurisdiction *sua sponte*, if necessary.  *See* Fed. R. Civ. P. 12(h)(3).  Thus, in

cases involving forum-selection clauses, both district and circuit courts would be under an obligation to confirm that the clause was not applicable before reaching the merits of the action . . . .   More importantly a motion to dismiss under Rule 12(b)(1) is non-waivable and may be brought at any time—even on appeal— regardless of whether a litigant raised the issue in an initial pleading.   Litigants, therefore, could hold back forum-selection clause objections, until after discovery—or even an adverse verdict.

Moreover, the Fourth Circuit has recognized that Rule 12(b)(6) "is not the appropriate motion for enforcing a forum-selection clause."  *Id.* at 549. It explained that "because a 12(b)(6) motion may be brought at any time prior to adjudication on the merits, analyzing forum-selection clauses under Rule 12(b)(6) would present some of the same timing concerns as in the 12(b)(1) context."  *Id.* (citations omitted).   The Court reasoned: "Analyzing forum-selection agreements under Rule 12(b)(3) would avoid the doctrinal and timing disadvantages of utilizing Rule 12(b)(1) or (6) and be consistent with Supreme Court precedent."   *Id.* (citing *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285 (11th Cir. 1998) (finding that motions to dismiss based on forum-selection clause should be analyzed under Rule 12(b)(3) based on the Supreme Court's decision in *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988)); *see also Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 365 n.9 (4th Cir. 2012) (affirming that a challenge based on a forum-selection clause, including an arbitration clause, should be addressed by way of a motion to dismiss for improper venue under Rule 12(b)(3)).

Nevertheless, other judges of this court have considered motions to dismiss in favor of arbitration under Rule 12(b)(1), Rule 12(b)(6), and Rule 56.  *See, e.g., Willcock*, 2018 WL 3970474, *3 (collecting cases).  As Judge Gallagher explained, *Coady v. Nationwide Motor Sales Corp.*, SAG-20-1142, 2020 WL 6785352, at *3 (D. Md. Nov. 18, 2020), *aff'd*,  2022 WL 1207161: "'Motions to compel arbitration exist in the netherworld between a motion to dismiss and a motion for summary judgment,' and '[w]hether the motion should be treated as a motion to dismiss or a

motion for summary judgment turns on whether the court must consider documents outside the pleadings." (quoting *PC Const. Co. v. City of Salisbury*, 871 F. Supp. 2d 465, 477-78 (D. Md. 2012) (alteration in *Coady*)); *see also Berkeley Cty. Sch. Dist.*, 944 F.3d at 234 ("To decide whether 'sufficient facts' support a party's denial of an agreement to arbitrate, the district court is obliged to employ a standard such as the summary judgment test."); *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 241-42 (4th Cir. 2017) (affirming the district court's decision to evaluate a motion to compel arbitration under the summary judgment standard).

Here, the parties have presented arguments that are predicated on documents extrinsic to the suit. *See*, *e.g.*, ECF 19-1 at 9-10 (relying on the Arbitration Agreement); ECF 20 at 24-27 (invoking the Handbook). Generally, in evaluating the validity of an arbitration agreement, a court may consider certain documents extrinsic to the complaint. *See Coady*, 2022 WL 1207161 at *2-3; *Iraq Middle Mkt. Dev. Found.*, 848 F.3d at 241-42; *PC Const. Co.*, 871 F. Supp. 2d at 477-78. Therefore, I may consider the exhibits submitted with the Motion and plaintiff's opposition, including the Cobler Declaration (ECF 19-2 at 2-3); the Arbitration Agreement (*id.* at 5-7); the Screenshot (*id.* at 9; *see also* ECF 20-2); the AAA Rules (ECF 19-2 at 11-46); and the Handbook (ECF 20-1). And, I will apply the summary judgment standard in resolving the Motion. *See Coady*, 2020 WL 6785352, at *3

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found.*, 848 F.3d at 238. To avoid summary judgment, the nonmoving party must demonstrate that there

is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

"A party opposing a properly supported motion for summary judgment  'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042

(2004); *see Celotex*, 477 U.S. at 322-24.  And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party.  *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007).  Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)).  In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012) (per curiam).

### 3.  Choice of Law

As discussed below, the parties dispute whether they formed an enforceable agreement to arbitrate any disputes that arise relating to plaintiff's employment.  *See* ECF 20 at 20-28; ECF 21 at 4-10.  And, "[w]hether an agreement to arbitrate was formed is . . . a question of ordinary state contract law principles."   *Rowland*, 993 F.3d at 258 (quoting *Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 563 (4th Cir. 2015)); *accord Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989); *James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421-22 (4th Cir. 2004).

Plaintiff contends that Illinois law is of relevance because the Arbitration Agreement incorporates it.  ECF 20 at 18-19; *see id.* at 34-35. Specifically, the Arbitration Agreement provides, ECF 19-2 at 5:  "[B]oth ATI and the Employee agree that any claim, dispute, and/or controversy that either the Employee or ATI may have against the other shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act, in conformity with the procedures of the Illinois Revised Statutes Chapter 710, ILCS § 5 et seq."

However, this provision does not purport to bear on what law governs interpretation of the Arbitration Agreement, or the formation thereof; it states only that arbitration shall proceed in conformity with the procedures contemplated by the FAA, and in conformance with Illinois law. Indeed, Malamatis states: "Whether or not the parties agreed [to arbitrate] here is a question of Maryland contract law."  ECF 20 at 20 (emphasis omitted).

The Arbitration Agreement does not contain a choice-of-law provision.  But, Maryland is the forum state.  Therefore, I must apply Maryland substantive law, including its choice of law rules, to determine which state's substantive law applies to the Arbitration Agreement.  *Small v. WellDyne, Inc.*, 927 F.3d 169, 173 n.3 (4th Cir. 2019); *Francis v. Allstate Ins. Co.*, 709 F.3d 362,

369 (4th Cir. 2013); *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th

Cir. 2009). For a contract claim, Maryland applies the law of the state in which the contract was

formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of

another state. *See, e.g. Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204

(2015); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists

Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v.

Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372,

86 A.3d 1245 (2014).

The parties agree that the Arbitration Agreement was executed in Maryland and that

Maryland law governs the issues implicated in the Motion. *See* ECF 19-1 at 9; ECF 20 at 20.

Therefore, in resolving the Motion, I shall apply Maryland law.

## B. Discussion

Malamatis advances a number of arguments in opposition to the Motion. First, plaintiff

maintains that the Court should reject the Motion because the terms of the Handbook rendered the

Arbitration Agreement illusory and thus unenforceable. ECF 20 at 10. Further, Malamatis states

that in the event that the Court finds that the Arbitration Agreement is not illusory, the Court should

find that "it did not survive the termination of Mr. Malamatis who is no longer an 'Employee' of

ATI" or, in the alternative, "Mr. Malamatis opted out of it under the terms of the Handbook and

Illinois law." *Id.* at 10-11. And, in the event that the Court "were to find Mr. Malamatis'

arguments unavailing," plaintiff urges the Court to "stay the matter consistent with Illinois law and

the terms of the 'Agreement.'" ECF 20 at 11.

As discussed, *infra*, the Employee Handbook is a separate document, distinct from the

Arbitration Agreement. Therefore, in contrast to the Fourth Circuit's recent decision in *Coady*,

2022 WL 6785352, it does not render the parties' Arbitration Agreement illusory.  Further, there is no indication that plaintiff opted out of the Arbitration Agreement.  Moreover,  based on the terms of the Arbitration Agreement, it is readily apparent that the parties agreed that the arbitrator should determine arbitrability.   And, in my view, because plaintiff's remaining arguments, characterized broadly, concern the validity of the Arbitration Agreement, rather than its existence, they are for the arbitrator to decide.  Finally, I am persuaded that dismissal of the suit is warranted because all of plaintiff's claims are subject to the Arbitration Agreement.

### 1.  Illusory Agreement

Plaintiff's opposition to the Motion is, in large part, predicated on the assertion that the Arbitration Agreement is illusory, and thus there exists no enforceable agreement to arbitrate.  *See* ECF 20 at 19-29.  As the Fourth Circuit recently explained, *Rowland*, 993 F.3d at 258 (alterations in *Rowland*):

> While "'parties may agree to have an arbitrator decide . . . gateway questions of arbitrability,'" such an agreement does not "preclude a court from deciding that a party never made an agreement to arbitrate *any* issue." *Id.* (quoting *Henry Schein*, 139 S. Ct. at 529).  That is, it does not erase the court's obligation to determine whether a contract was formed under 9 U.S.C. § 4.

Indeed, Section 4 of the FAA specifies that "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof."  9 U.S.C. § 4; *see also Granite Rock Co.*, 561 U.S. at 296 (explaining that where parties dispute whether an agreement to arbitrate was formed, "the dispute is generally for courts to decide").  And, as indicated, because the Arbitration Agreement was executed in Maryland, the parties agree that Maryland law governs the issue of contract formation.

In general, under Maryland law, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way

recognizes as a duty." RICHARD A. LORD, 1 WILLISTON ON CONTRACTS, § 1:1 (4th ed. 1990) ("WILLISTON ON CONTRACTS"); *accord* RESTATEMENT (SECOND) CONTRACTS, § 1 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's Cty. v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984), *cert. denied*, 405 Md. 63, 949 A.2d 652 (2008)). Thus, mutual assent is an integral component of every contract. *See, e.g.*, *Joseph Saveri Law Firm Inc. v. Michael E. Criden, P.A.*, 759 F. App'x 170, 173 (4th Cir. 2019) (per curiam) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

In determining whether there is an enforceable contract, courts begin the analysis "by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms. " (citations omitted)). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

A contract ordinarily is not enforceable unless it is supported by consideration. *Harford Cnty. v. Town of Bel Air,* 348 Md. 363, 381, 704 A.2d 421, 430 (1998). "In Maryland,

consideration may be established by showing 'a benefit to the promisor or a detriment to the promisee.'"  *Cnty. Comm'rs for Carroll Cnty. v. Forty W. Builders, Inc.,* 178 Md. App. 328, 384–85, 941 A.2d 1181, 1213 (2008) (citations and some internal quotation marks omitted), *cert. denied,* 405 Md. 63, 949 A.2d 652 (2008).  The Maryland Court of Appeals has said: "A promise becomes consideration for another promise only when it constitutes a binding obligation.  Without a binding obligation, sufficient consideration does not exist to support a legally enforceable agreement."  *Cheek v. United Healthcare of Mid–Atl., Inc.,* 378 Md. 139, 148, 835 A.2d 656, 661 (2003).

An illusory promise cannot constitute valid consideration.  *See* 2 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 5.28 (2003) (stating that "an illusory promise is neither enforceable against the one making it, nor is it operative as consideration for a return promise," and that "if there is no other consideration for a return promise, the result is that no contract is created."); RESTATEMENT OF CONTRACTS 2d § 77 cmt. a (1981) ("Where the apparent assurance of performance is illusory, it is not consideration for a return promise.").  In *Cheek,* the Maryland Court of Appeals explained that "[a]n 'illusory promise' appears to be a promise, but it does not actually bind or obligate the promisor to anything," because performance is "'entirely optional.'"  *Cheek,* 378 Md. at 148–49, 835 A.2d at 662 (2003) (quoting RESTATEMENT OF CONTRACTS 2d § 2 cmt. e).  When the promisor "'retains an unlimited right to decide later the nature or extent of his performance,'" this "'unlimited choice in effect destroys the promise and makes it merely illusory.'"  *Cheek,* 378 Md. at 149, 835 A.2d at 662 (quoting WILLISTON ON CONTRACTS § 4:24 (4th ed. 1990)).

In essence, plaintiff maintains that the parties' agreement to arbitrate was illusory because the Employee Handbook empowered ATI to modify the terms contained therein.  ECF 20 at 19-

29; *see* ECF 20-1 at 8 (stating that ATI "reserves the right to make changes to the policies, procedures and other statements made in this employee handbook" and "ATI retains the sole right in its business judgment to modify, suspend, interpret, or cancel, in whole or in part, at any time, with or without notice, any published or unpublished policy, practice, procedure, process or benefit").  And, according to plaintiff, because the Handbook contained a copy of the Arbitration Agreement (ECF 20-1 at 175-78), the power to modify applied to the Arbitration Agreement.  Put another way, because ATI reserved the right to change the policies contained within the Handbook, plaintiff argues that defendant necessarily also had the ability to modify the terms of the Arbitration Agreement.  ECF 20 at 24-26.  Therefore, Malamatis claims that the Arbitration Agreement is illusory and thus unenforceable.

Several cases guide the analysis.  They include one that the Fourth Circuit decided a few weeks ago, *Coady*, 2022 WL 1207161[11], as well as *Cheek*, 378 Md. 139, 835 A.2d 656; *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540 (4th Cir. 2005); and *Boettcher v. SSC Glen Burnie Operating Company, LLC*, WMN-15-3714, 2016 WL 4395880 (D. Md. Aug. 18, 2016).  *See also Cherdak v. ACT, Inc.*, 437 F. Supp. 3d 442, 456 (D. Md. 2020) (looking to *Cheek* and *Hill* for guidance in similar circumstances); *accord Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 594 (D. Md. 2013); *Jones v. Prosper Marketplace, Inc.*, GJH-21-893, GJH-21-1126, GJH-21-1914, 2022 WL 834210, at *12-13 (D. Md. Mar. 21, 2022); *Ratliff v. CoStar Realty Info., Inc.*, DKC-11-0813, 2011 WL 2680585, at *3-4 (D. Md. Jul. 7, 2011); *Sedelnikova v. The Cheesecake Factory Restaurant, Inc.*, AW-09-2398, 2010 WL 2367387, at *3-4 (D. Md. Jun. 7, 2010).

---

[11] *Coady* was decided by the Fourth Circuit during the pendency of the Motion.  But, the parties did not seek to supplement their submissions to address the import of the decision.

In *Cheek*, 378 Md. at 141, 835 A.2d at 657, the plaintiff, Ronnie Cheek, was orally offered a position of employment with the defendant, United Healthcare of the Mid-Atlantic, Inc. ("United"), "which was confirmed in writing the same day."   United specified in a letter to the plaintiff that its employment offer was contingent upon, *inter alia*, Cheek's acceptance of United's "'Employment Arbitration Policy'" (the "Policy").  *Id.*, 835 A.2d at 658.  According to the letter, the Policy was summarized in a document that accompanied the letter.  *Id.*[12]

Thereafter, Cheek accepted United's offer of employment.  *Id.* at 142, 835 A.2d at 658. And, on his first day of employment with United, "he received a copy of United's Employee Handbook," which contained summaries of the Policy.  *Id.* It specified that Cheek was required to submit any disputes with defendant to an internal dispute review process and, if necessary, arbitration.  *Id.* But, the Policy also reserved to United the unilateral "right to alter, amend, modify, or revoke the Policy at its sole and absolute discretion at any time with or without notice."  *Id.* at 142-43, 835 A.2d at 658.

Following Cheek's receipt of United's Employee Handbook, he "signed an 'Acknowledgment Form for the Code of Conduct and Employment Handbook[,]'" pursuant to which he "acknowledged that he had 'specifically received and reviewed,' among other things an 'Internal Dispute Resolution/Employment Arbitration Policy.'"  *Id.* at 143, 835 A.2d at 658 (quoting record).  The form also stated: "I understand that UnitedHealth Group Employment Arbitration Policy is a binding contract between UnitedHealth Group and me to resolve all

---

[12] The plaintiff later disputed that the summary accompanied the letter.  *See Cheek*, 378 Md. 139 at 141 n.2, 835 A.2d at 658 n.2.  However, the trial court did not make any such finding, and the decision in *Cheek* did not rely on whether a summary of the Policy was included with the letter.  *Id.*

employment-related disputes which are based on a legal claim through final and binding arbitration." *Id.*

Approximately seven months after beginning his position, Cheek was informed that "United was eliminating his position . . . ." *Id.* Thereafter, Cheek filed suit against United in a Maryland court. *Id.*, 835 A.2d at 658-59. United then filed a "Motion to Dismiss and/or Compel Arbitration and Stay", which the circuit court granted. *Id.*, 835 A.2d at 659.

On appeal, United argued that, notwithstanding the discretion it had as to the terms of the Policy, plaintiff's continued employment constituted sufficient consideration to support the Policy. *Id.* at 152, 835 A.2d at 664. Stated differently, "United assert[ed] that, by providing Cheek with a job, it has given sufficient consideration for Cheek's promise to arbitrate employment disputes, so that United's promise [was] not illusory." *Id.* But, the Maryland Court of Appeals flatly rejected this argument and reversed. *Id.* at 143-44, 835 A.2d at 659. It said: "To agree with United would place this Court in the untenable position of having to go beyond the confines of the arbitration itself and into an analysis of the validity of the larger contract, an inquiry we cannot make." *Id.* at 152, 835 A.2d at 664.

In particular, the Maryland Court of Appeals determined that the Policy was illusory and thus unenforceable. *Id.* at 161, 835 A.2d at 669. In pertinent part, it reasoned that United retained unfettered discretion to change the terms contained within the Policy. *Id.* at 149, 835 A.2d at 662. Thus, by the plain terms of the Policy, "United's 'promise' to arbitrate employment disputes [was] entirely illusory, and therefore, no real promise at all." *Id.* And, "because United's promise to arbitrate was illusory," United's employment of Cheek "cannot serve as  consideration for the arbitration agreement." *Id.* at 161, 835 A.2d at 669.

The Fourth Circuit encountered a similar issue in *Hill*, 412 F.3d 540.  In that case, Peoplesoft USA, Inc. ("Peoplesoft") issued the plaintiff, Hill, a written offer letter, which provided that, "as a condition of her employment, Hill would have to sign a separate arbitration agreement." *Id.* at 542.  "The Arbitration Agreement signed by the parties [was] a comprehensive six-page document" that set forth "both Hill and Peoplesoft's obligations concerning arbitration," and bound the parties "to arbitrate all claims arising out of Hill's employment relationship with PeopleSoft, with certain enumerated exceptions." *Id.* at 542 (internal quotation marks omitted).  Notably, "neither party reserved the right to modify the agreement's terms."  *Id.*

The offer letter "also indicated that Hill, by accepting PeopleSoft's offer of employment, was agreeing to be bound by the company's 'Internal Dispute Solution' program (the IDS Program)."  *Id.*  But, "[u]nlike the Arbitration Agreement," the IDS Program was "a company policy generally applicable to all employees."  *Id.* (internal quotation marks omitted).  And, notably, "in the IDS Program Peoplesoft reserved the right to change the program without notice." *Id.* (internal quotation marks omitted).

Hill later brought suit in federal court, asserting claims for, among other things, discrimination and retaliation.  *Id.*  Peoplesoft moved to compel arbitration, which the district court denied, finding that, in light of Peoplesoft's right to change the terms of the IDS Program, the parties' agreement to arbitrate was illusory.  *Id.*

On appeal, the Fourth Circuit vacated the decision of the district court and remanded the case "with instructions to grant PeopleSoft's motion to compel arbitration."  *Id.* at 545.  Principally, the Fourth Circuit concluded that the "the district court's reasoning [was] flawed" because "per *Cheek*," it "was not allowed to look beyond the separate Arbitration Agreement, signed by the parties, to determine whether [it] was supported by consideration."  *Id.* at 543.  Further the Court

said: "Had the [district] court confined its analysis to the Arbitration Agreement, most assuredly, the court would have concluded that the Arbitration Agreement was supported by consideration." *Id.* at 543-544.

Of import here, the *Hill* Court summarized the distinction between the facts presented in its case and those in *Cheek*, as follows, *id.* at 544:

> Unlike this case, the reservation of rights in *Cheek* was contained in the arbitration policy. Looking at the four corners of the arbitration policy in *Cheek*, the court understandably concluded that the policy contained an illusory promise. In the instant case, by contrast, looking at the four corners of the separate Arbitration Agreement, the agreement contains no such illusory promise. To be sure, it is only when we are asked to look beyond the four corners of the Arbitration Agreement and examine the IDS Program—something *Cheek* tells us we are not allowed to do—that Hill's argument finds its support.

Thus, in the Fourth Circuit's view, because the district court "was not at liberty to go beyond the language of the Arbitration Agreement in determining whether the agreement contained an illusory promise," it erred in it considering whether Peoplesoft elsewhere retained the right to change the IDS Program. *Id.* And, because the language of the agreement unambiguously required the parties to submit their disputes to arbitration, the Fourth Circuit determined that it was binding and enforceable. *Id.*

The Fourth Circuit reaffirmed *Hill* in its recent decision in *Coady*, 2022 WL 1207161. In that case, "[f]ormer employees of Nationwide Motor Sales Corporation sued the company and its owners (collectively, Nationwide) in district court, alleging fraudulent payment practices that reduced employees' sales commissions and final paychecks." *Id.* at *1. Nationwide moved to compel arbitration and to dismiss or to stay proceedings. *Id.* To bolster its argument, Nationwide "produced its Employee Handbook, which contain[ed] a section entitled 'Agreement to Submit All Employment Disputes to Arbitration.'" *Id.* (quoting record).

- 33 -

"The first four paragraphs of the Arbitration Agreement state an intention to arbitrate employment related claims and specify the rules and procedures that shall apply." *Id.* The fifth paragraph of the Arbitration Agreement read: "'**By my signature on the 'Employee Handbook and Operating Procedures' Acknowledgment Receipt, I confirm that I have read and understand each of the four sections set forth above in this Agreement**.'" *Id.* (quoting record) (bold in *Coady*). Notably, the "referenced Acknowledgement Receipt provides," in part: "I the undersigned (Employee), acknowledge[ ] receipt of the (Employer) 'Employee Handbook and Dealer Operating Procedures' written publication **and** have read and understood all sections therein . . .", including the "Agreement to Submit All Employee Disputes to Arbitration". *Id.* (alteration, bold, and underlining in *Coady*).

The Acknowledgement Receipt also specified: "*I further understand that the employer has the right, from time to time, to make and enforce new policies or procedures and to enforce, change, abolish or modify existing policies, procedures or benefits applicable to employees as it may deem necessary with or without notice*." *Id.* (italics in *Coady*). Further, this paragraph specified: "As a condition of my employment, I agree to conform to any such policy, rule, or regulations, whether currently in effect or established in the future." *Id.* And, "[d]irectly below this paragraph [were] lines for the employee and the manager to sign the Acknowledgement Receipt." *Id*.

At the district court, Judge Gallagher denied Nationwide's motion to compel arbitration. She determined that "the Arbitration Agreement [was] illusory due to the Modification Clause," identified in italics above. *Id.* at *2 (citing *Coady*, 2020 WL 6785352, at *6). The Fourth Circuit affirmed.

On appeal, Nationwide claimed that the Modification Clause should have no effect on the Arbitration Agreement, because it was contained within a distinct document., which existed outside of the Arbitration Agreement.  *Id.* at * 2.  And, per *Hill,* 412 F.3d at 544, Nationwide argued that a court "may not look outside the 'four corners' of the Arbitration Agreement to consider the Receipt."  *Id.* at *3.

The Fourth Circuit first determined whether the Acknowledgement Receipt was part of the Arbitration Agreement.  *Id.* at *2.  It concluded that the Receipt was part of the Arbitration Agreement.  *Id.* at *3.  The Fourth Circuit explained:  "The fifth paragraph of the Arbitration Agreement incorporates the Receipt, stating that an employee's signature on the Employee Handbook and Operating Procedures' Acknowledgement Receipt . . . confirm[s] that [he] ha[s] read and understand[s] each of the four sections set forth above in this Agreement."  *Id.* (some internal quotation marks omitted; alterations in *Coady*).  The Court reasoned, *id.*: "In operation, an employee signs the Receipt to assent to the Agreement."  *Id.*  Further, because the "Receipt itself also specifically identifies the Arbitration Agreement as one of the Handbook sections to which the Receipt 'specially' applies[,]" the "Receipt therefore must be read in conjunction with the Arbitration Agreement."  *Id.* (alteration added).

The Fourth Circuit also noted that its analysis was wholly consistent with *Hill*, 412 F.3d 540.  It reasoned, 2022 WL 1207161, at *2:

> Here, the "language of the arbitration agreement itself" incorporates the Acknowledgment Receipt in its fifth paragraph. [*Hill*, 412 F.3d] at 543. And, unlike *Hill*, where the arbitration agreement was signed by the parties, the Receipt here serves as the signature page for the Arbitration Agreement. It is therefore appropriate for us to consider the Receipt when evaluating the Arbitration Agreement.

In addition, the *Coady* Court concluded that the Modification Clause reserved to Nationwide the ability to abolish, change, or alter existing policies and procedures, without notice.

*Id.* If it applied to the Arbitration Agreement, the parties agreed it would render the Arbitration Agreement illusory.  *Id.*  In the Court's view, the Receipt "encompasses all sections of the Handbook, including those 'specially' acknowledged in the Receipt like the Arbitration Agreement."  *Id.*  Thus, the Fourth Circuit concluded: "Because the Modification Clause gives Nationwide the right to change or abolish those policies, procedures, and benefits without notice, the Arbitration Agreement is illusory under Maryland law."  *Id.* (citing *Cheek*, 378 Md. 159-60, 835 A.2d at 668).

Here, as in *Hill*, the "freestanding" Arbitration Agreement unambiguously requires the parties to arbitrate any disputes arising between them that bear any relationship to or connection with plaintiff's employment with ATI.  *Hill*, 412 F.3d at 542; *see* ECF 19-2 at 5-7.[13]  Further, both parties waived their right to a trial by jury of any claims subject to the terms of the Arbitration Agreement.  ECF 19-2 at 7.  And, the Arbitration Agreement is devoid of any suggestion that ATI was unilaterally empowered to modify its terms.  The mutual exchange of promises plainly provides sufficient consideration to render the Arbitration Agreement enforceable.  *See Harford County v. Town of Bel Air*, 348 Md. 382, 704 A.2d 421, 430 (1998) (explaining that  in Maryland, consideration may be established by showing "'a benefit to the promisor or a detriment to the promisee'") (quoting *Vogelhut v. Kandel*, 308 M. 183, 191, 517 A.2d 1092, 1096 (1986)).

In *Boettcher*, 2016 WL 4395880, the plaintiff executed a standalone agreement to submit any employment-related disputes to an "Employment Dispute Resolution Program," which culminated in mandatory arbitration (the "EDRP Agreement").  *Id.* at *1.  The plaintiff also received a "booklet" that provided an overview of the EDRP process (the "EDRP Booklet"). *Id.*

---

[13] As mentioned above, the Arbitration Agreement indicates that some claims are excepted from this broad mandate.  *See* ECF 19-1 at 5.  But, no exception is relevant to plaintiff's suit.

Additionally, the employer provided the plaintiff with an employee handbook, which included, among other things, "a section regarding the EDRP and refer[red] to the EDRP Booklet." *Id.* And, as in this case, the employee handbook contained a provision that reserved to the employer the right to modify any policies contained within it. *Id.*

Following the plaintiff's termination from employment, he brought suit in federal court against the employer and the employer's corporate owner. *Id.* at *1. The defendants moved to compel arbitration. *Id.* As in this case, the plaintiff argued that the modification provision of the employee handbook rendered the EDRP Agreement illusory. *Id.* at *2.

Judge Nickerson rejected the plaintiff's argument. He reasoned that, unlike the circumstances present in *Cheek*, "Defendants' alleged retention of the right to amend or revoke the EDRP is found in a separate document, the Employee Handbook." *Id.* at *3. And, in his view, "[t]his discrepancy [was] outcome determinative" because nothing in the four corners of the EDRP Agreement empowered the defendants to modify the terms contained within it. *Id.* Further, Judge Nickerson observed that the "EDRP Agreement unequivocally sets forth both parties' rights and obligations concerning dispute resolution, and mandates arbitration as the final and exclusive means for resolution." *Id.* Referring to the EDRP Agreement, the court added, *id.*: "Defendants have not reserved for themselves the right to alter, amend, modify or revoke this obligation." Accordingly, the court concluded that the EDRP Agreement was supported by valid consideration and thus enforceable. *Id.*

"'[P]arties to a written contract are usually free to modify or terminate . . . contract[s] by separate agreement.'" *600 N. Frederick Rd., LLC v. Burlington Coat Factory of Md., LLC*, 419 Md. 413, 439, 19 A.3d 837, 853 (2011) (quoting *Comptroller of the Treasury v. Citicorp Int'l Commc'ns*, 389 Md. 156, 185, 884 A.2d 112, 129 (2005) (Wilner, J., dissenting) (alterations in

*600 N. Frederick Rd., LLC*).   And, consistent with this principle, the Arbitration Agreement indicates that "any agreement contrary to the foregoing must be entered into, in writing, by the Vice President of Human Resources for ATI."   *Id.*   The Arbitration Agreement specifies that it may be modified, but only if the employee and ATI's Vice President of Human Resources agree to do so.   In other words, as indicated, ATI cannot unilaterally alter the terms.

Further, unlike the agreement at issue in *Coady*, the Arbitration Agreement does not reference external documents, such as the Employee Handbook or the Acknowledgement, or otherwise give effect to any of the policies contained within the Handbook.   Indeed, plaintiff executed the Arbitration Agreement separate and apart from any other policy contained within the Handbook. *See id.* at 9.   And, the Arbitration Agreement expressly provides that it is the exclusive and entire agreement between the parties regarding arbitration.   *See id.* at 7.

Plaintiff emphasizes that a copy of the Arbitration Agreement is contained within the Handbook.   ECF 20 at 27.   Malamatis also claims, albeit without any corroborating documentation, that as a component of "ATI's standard procedure," it required its employees to execute the Acknowledgement, thereby indicating their understanding of the policies contained within the Handbook.   *Id.* at 26; *see* ECF 20-1 at 173 (the Acknowledgement).   And, in turn, the Handbook contains provisions that allow ATI to modify the terms of the policies contained within it.   *See* ECF 20 at 19, 24-29.   However, as ATI aptly maintains (ECF 21 at 2-3), I may not read the Arbitration Agreement in light of the Handbook or the Acknowledgement because to do so would be to look beyond the four corners of the separate, stand-alone version of the Arbitration Agreement.   *See* ECF 19-2 at 5-7; *see also id.* at 9.   That the Handbook authorizes changes to policies and procedures contained in the Handbook does not transform the Arbitration Agreement to such a provision.

To be sure, the Handbook contains an unsigned copy of the Arbitration Agreement.  In context, it is a form or sample.  And, the section of the Handbook that includes a copy of the Arbitration Agreement does not contain any text that suggests it is a policy subject to modification by ATI.  *See* ECF 20-1 at 175-78.  Indeed, the Handbook indicates that the policies contained within it are intended only to serve as a reference guide for ATI employees.  The Handbook states, *id.* at 7: "This employee handbook provides a brief summary of some important information about the Company and your employment with the Company."  Moreover, this section provides: "[P]lease note that this employee handbook is provided as a guide and is not considered to be a contract."  *Id.*  And, the Acknowledgement specifies that the Handbook "is not all inclusive" and that "the contents of this handbook do not constitute an express or implied contract of employment."  *Id.* at 173.

Against this backdrop, it stands to reason that the Handbook's inclusion of a copy of the Arbitration Agreement served only as a notification to ATI employees that ATI generally seeks to enter into agreements with its employees to arbitrate any employment-related disputes that arise between them.  Indeed, if this copy of the Arbitration Agreement constituted an operative agreement between ATI and its employees, solely by its inclusion in the Handbook and plaintiff's purported execution of the Acknowledgement, it is unclear why ATI would have also required Malamatis to execute a duplicate, freestanding version of the Arbitration Agreement.  *Accord Sedelnikova*, 2010 WL 2367387, at *3 ("[T]he Court finds it would be superfluous for the employee to agree to the arbitration proceedings for a second time, had they been merely part of the Handbook policies."); *Dieng v. Coll. Park Hyundai*, DKC-09-0068, 2009 WL 2096076, at *4 (D. Md. Jul. 9, 2009) ("It would be redundant to require one's employees to sign an acknowledgment form agreeing to all of the policies in the Employee Handbook and then have

them sign another agreement on the opposite page reaffirming their consent to abide by a specific policy contained therein.").

The Arbitration Agreement plainly requires both parties to arbitrate any disputes arising between them that have any connection to plaintiff's employment with defendant. ECF 19-1 at 5. By its terms, ATI did not reserve to itself the power of modification. Because ATI's ability to modify the policies contained within the Handbook does not extend to the Arbitration Agreement, the Arbitration Agreement is not illusory or unenforceable. *See Hill*, 412 F.3d at 544; *Boettcher*, 2016 WL 4395880, at *3. And, there is sufficient, bargained-for consideration to support a finding of an enforceable agreement to arbitrate between the parties.

### 2. Opt-Out

Plaintiff also argues that the Arbitration Agreement is void because he "Had the Right to, and Did Opt-Out of the Arbitration Clause." ECF 20 at 33 (emphasis omitted). To that end, Malamatis notes that, in executing the Arbitration Agreement, he was provided with the opportunity to opt-out of its provisions. ECF 20 at 33-34. Moreover, in his view, the language of the opt-out provision was not time-limited, nor did it require him to opt-out "in any specific form." *Id.* at 34. Thus, he implies that, by bringing the instant suit, he has indicated his intention to opt-out of the Arbitration Agreement, and should not be bound by it.

In my view, the contention is without merit. As reflected above, the Screenshot reflects the following statement, ECF 19-2 at 9:

> I have been provided a copy of the Arbitration Agreement and have decided by my acknowledgement below that I have read, understand, and am legally bound by the attached agreement. If I choose to opt-out of the "Arbitration Agreement" I must indicate in the comment section below my desire to opt-out.
> I understand that I may not opt-out of the arbitration provisions of the "Arbitration Agreement" while I have any legal claim pending which arose prior to my

execution of this form and which has been or could have been submitted to arbitration under the "Arbitration Agreement" at the time the claim arose.

The first paragraph makes plain that if plaintiff intended to opt-out of the Arbitration Agreement, he was required to indicate such an intention in the "comment section." ECF 19-2 at 9. However, plaintiff did not do so. *See id.*

Nonetheless, plaintiff asserts the Screenshot indicates that he may opt-out of the Arbitration Agreement at any point in time. He contends: "The language 'I may not opt-out . . . while I have any legal claim pending' suggests the limit is conditionally-, not temporally-based." ECF 20 at 34 (omission in ECF 20). And, he speculates that "[i]f ATI had intended a time frame, the phrase would likely have read 'you have only one opportunity to opt-out and it is now.'" *Id.*

But, plaintiff's claim relies on a strained reading of the second paragraph reflected in the Screenshot. As an initial matter, there is no suggestion that the second paragraph modifies the mandatory language included in the first paragraph, which, by its plain terms, required plaintiff to indicate in the "comment section" his desire to opt-out of the Arbitration Agreement. ECF 19-2 at 9.

Moreover, a better reading of the second paragraph is that, by executing the Arbitration Agreement, plaintiff was precluded from opting-out of the agreement with respect to any claims that he may have had against defendant, which "arose prior to [the] execution of [the Arbitration Agreement] and which [had been] or could have been submitted to arbitration under the 'Arbitration Agreement' at the time the claim arose.'" *Id.* Notably, the Amended Complaint is devoid of any suggestion that plaintiff's suit is predicated on claims that arose prior to the execution of the Arbitration Agreement. *See* ECF 17, ¶¶ 23-133. Thus, it is not clear what effect, if any, the second paragraph has on this suit.

In any event, even if plaintiff could have opted-out of the Arbitration Agreement after the execution of the Arbitration Agreement, there is no indication in the Amended Complaint, the parties' briefing, or the exhibits filed in support thereof, that he ever attempted to do so.  And, to the extent that plaintiff means to assert that he manifested his intention to opt-out of the Arbitration Agreement by initiating this suit, such a position is untenable.  Indeed, endorsing this argument would effectively empower Malamatis to nullify the Arbitration Agreement in the exercise of his sole discretion.

The Screenshot plainly establishes that plaintiff did not opt-out of the Arbitration Agreement when presented with the opportunity to do so. *See* ECF 19-2 at 9.  Accordingly, plaintiff's argument that he opted-out of the Arbitration Agreement is wide of the mark.

### 3.  Arbitrability

Having found that an agreement to arbitrate exists between the parties, I must next consider the issue of arbitrability.  ATI claims that the Arbitration Agreement clearly delegated the question of arbitrability to the arbitrator.  First, defendant notes that "a covered dispute under the Parties' Arbitration Agreement is unqualified and is more than broad enough to include disputes of arbitrability."   ECF 19-1 at 8; *see* ECF 19-2 at 5.  Moreover, "the Arbitration Agreement incorporates AAA Employments Rules," pursuant to which the arbitrator is empowered to "'rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.'"  ECF 19-1 at 8 (quoting ECF 19-2 at 22).  Thus, in ATI's view, "[t]hrough this 'delegation' clause, ATI and Plaintiff 'clearly and unmistakably provided that the arbitrator—and not a court—would decide the gateway issue."  ECF 19-1 at 8.

It is not clear whether Malamatis objects to ATI's contentions regarding the arbitrability of the instant dispute.  Indeed, although plaintiff devotes a substantial portion of his opposition to

summarizing the import of the relevant case law on this issue (ECF 20 at 11-19), he does not indicate whether, in his view, the Arbitration Agreement reflects that the parties intended to delegate the issue of arbitrability to the arbitrator. But, he does seem to minimize the significance of the incorporation of the AAA Rules in the Arbitration Agreement. *See* ECF 20 at 11. So, I shall proceed under the assumption that plaintiff opposes the Motion on this basis.

To resolve the question of arbitrability, the Court must first "determine *who* decides whether a particular dispute is arbitrable: the arbitrator or the court. Second, if [the Court] conclude[s] that the court is the proper forum in which to adjudicate arbitrability, [the Court] then decide[s] *whether* the dispute is, in fact, arbitrable." *Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union*, 665 F.3d 96, 101 (4th Cir. 2012) (emphases in original).

Although the Fourth Circuit has "adopted a 'general policy-based, federal presumption in favor of arbitration,' that presumption is not applied 'to resolve questions of the arbitrability of arbitrability issues themselves.'" *Id.* at 102 (quoting *Carson v. Giant Food, Inc.*, 175 F.3d 325, 329 (4th Cir. 1999)). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986) ) (internal brackets omitted); *accord Gibbs v. Haynes Investments, LLC*, 967 F.3d 332, (4th Cir 2020); *Novic v. Credit One Bank, Nat'l Ass'n*, 757 F. App'x 263, 265–66 (4th Cir. Jan. 4, 2019); *Del Webb Communities, Inc. v. Carlson*, 817 F.3d 867, 874 (4th Cir.), *cert. denied*, ___U.S.___, 137 S.Ct. 567 (2016); *Carson*, 175 F.3d 329.

"The 'clear and unmistakable' standard is exacting, and the presence of an expansive arbitration clause, without more, will not suffice." *Peabody*, 665 F.3d at 102. The test "requires more than simply saying that the arbitrator determines the meaning of any disputed contractual

terms." *Carson*, 175 F.3d at 329; *see, e.g.*, *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 527 (4th Cir. 2017) (quoting *Carson*, 175 F.3d at 330), *abrogated on other grounds by Henry Schein, Inc. v. Archer & White Sales, Inc.*, ___U.S.___, 139 S. Ct. 524 (2019)  (concluding that "'broad arbitration clauses that generally commit all interpretive disputes 'relating to' or 'arising out of' the agreement *do not* satisfy the clear and unmistakable test'") (emphasis in *Schein*); *E.I. DuPont de Nemours & Co. v. Martinsville Nylon Emps.' Council Corp.*, 78 F.3d 578, at *1 (4th Cir. 1996) (unpublished) (concluding that the clear and unmistakable test was not met where the contract provided for arbitration of "[a]ny question as to the interpretation of this Agreement or as to any alleged violation of any provision of this Agreement"); *see also Peabody*, 665 F.3d at 102. However, "[t]hose who wish to let an arbitrator decide which issues are arbitrable need only state that 'all disputes concerning the arbitrability of particular disputes under this contract are hereby committed to arbitration,' or words to that clear effect." *Carson*, 175 F.3d at 330-31.

Of import here, the Fourth Circuit has instructed that "when . . . two sophisticated parties expressly incorporate into a contract JAMS Rules that delegate questions of arbitrability to an arbitrator, then that incorporation constitutes the parties' clear and unmistakable intent to let an arbitrator determine the scope of arbitrability."  *Simply Wireless*, 877 F.3d at 529. Moreover, the Fourth Circuit recognized that "other circuits have concluded that the incorporation of arbitral rules substantively identical to those found in JAMS Rule 11(b)" constitutes clear and "unmistakable evidence of the parties' intent to arbitrate arbitrability."  *Simply Wireless*, 877 F.3d at 527.   Several of these circuit court decisions reached this conclusion about the incorporation of the AAA Rules.   *Id.*; *see Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *see also  Fallo v. High-Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009) (same); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1373 (Fed. Cir. 2006) (same); *Terminix Int'l Co. v. Palmer Ranch Ltd.*

*P'ship*, 432 F.3d 1327, 1332-33 (11th Cir. 2005) (same); *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (same). Indeed, in the wake of *Simply Wireless*, "courts in this Circuit have applied that incorporation principle to arbitral rules other than JAMS," including the AAA rules. *Sunbelt Residential Acquisitions, LLC v. Crowne Lake Assoc's*, *LP*, 1:20-CV-401, 2021 WL 512228, at *6 (M.D.N.C. Feb. 11, 2021) (collecting cases).

As mentioned above, the Arbitration Agreement expressly incorporated the AAA Rules, stating: "The AAA's 'Rules for Employee Dispute Resolution' will be used in any arbitration proceeding." ECF 19-2 at 6. And, Rule 6 of the AAA Rules indicates: "The arbitrator shall have the power to rule on his or her own jurisdiction, including nay objections with respect to the existence, scope or validity of the arbitration agreement." ECF 19-2 at 22. As numerous other courts have found, such language plainly delegates the issue of arbitrability to the arbitrator. *See*, *e.g.*, *Brenco Enterprises, Inc. v. Bitesquad.com, LLC*, 297 F. Supp. 3d 608, 612 (E.D. Va. 2018) (characterizing this language as "'clear and unmistakable'" and accordingly found "there is no doubt that the Agreement's arbitration clause manifests the parties' clear intention to commit the arbitrability determination to the arbitrator").

However, of relevance here, the Fourth Circuit twice stated in *Simply Wireless* that its holding applied to agreements between *sophisticated actors*. *See* 877 F.3d at 528, 529. It did not specify whether the incorporation of arbitration rules provides clear and unmistakable evidence of the parties' intent when at least one of the parties is not sophisticated, let alone provide guidance as to how a court might distinguish between sophisticated and unsophisticated parties.

To my knowledge, it remains an open question in this Circuit whether the incorporation of arbitration rules provides "clear and unmistakable" evidence of an unsophisticated party's intent to arbitrate arbitrability. *Compare In re Little*, 610 B.R. 558, 568-69 (Bankr. D.S.C. 2020) (citing

favorably to this Court's reasoning in *Stone v. Wells Fargo Bank, N.A.*, 361 F. Supp. 539, 555 (D. Md. 2019), as support for a finding that the incorporation of arbitral rules in an arbitration agreement, accepted by an unsophisticated student as a part of an online enrollment agreement, was not unmistakably clear evidence that the student intended to delegate the question of arbitrability to an arbitrator) *with Collins v. Discover Fin. Servs.*, PX-17-3011, 2018 WL 6434503, at *3 (D. Md. Dec. 7, 2018) (dismissing a similar argument as unpersuasive).

It is not immediately apparent whether Malamatis qualifies as a sophisticated or unsophisticated party, at least as it pertains to contracts plaintiff executed in association with accepting an offer of employment. Notably, however, plaintiff is a self-described "seasoned veteran of medical sales," who came to work at ATI with more than a decade of experience in the field. ECF 17, ¶ 39; *see id.* ¶ 31. Moreover, Malamatis did not argue that his lack of sophistication bears on whether the incorporation of the AAA Rules in the Arbitration Agreement amounts to unmistakably clear evidence that the parties intended to delegate the arbitrability question to an arbitrator. To the contrary, he appeared to call into question the viability of such reasoning. *See* ECF 20 at 15 n.13 (characterizing a case that, in his view, employed similar logic as "seeking to graft an exception" to the general policy preference favoring arbitration embodied in the FAA "for 'unsophisticated parties'").

Thus, in this context, and in the absence of any argument to the contrary, I am of the view that the incorporation of the AAA rules in the Arbitration Agreement constitutes unmistakably clear evidence that the parties intended to delegate the question of arbitrability to the arbitrator.

### 4.  Remaining Arguments

As mentioned above, Malamatis also claims that the Arbitration Agreement was rendered void upon his termination of employment with ATI (ECF 20 at 29-33), and that the Arbitration

Agreement violated Illinois law because it did not apprise him of his right to counsel.  *Id.* at 34-35.

In my view, these arguments are not appropriate for the Court to consider; they bear on the validity of the arbitration agreement, not its existence.  The Supreme Court has said that "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator."  *Buckeye Check Cashing, Inc.*, 546 U.S. at 449.  And, this is true even when the "contract as a whole" is an arbitration agreement, and the "arbitration clause" at issue is an agreement to delegate threshold questions to an arbitrator.  *See Rent-A-Center*, 561 U.S. at 71–72; *cf. Rowland*, 993 F.3d at 258 (noting that "when the parties disagree as to whether an agreement to arbitrate has been formed, 'the dispute is generally for courts to decide'") (quoting *Granite Rock Co.*, 561 U.S. at 296).

As explained above, I am persuaded that the Arbitration Agreement is not illusory, there is no indication that plaintiff opted-out of the Arbitration Agreement when presented with the opportunity to do so, and the parties plainly delegated the question of arbitrability to the arbitrator.  Thus, for present purposes, it is sufficient for the Court to note that plaintiff agreed to arbitrate disputes about his employment.

### 5.  The Remedy

Having found that the parties must arbitrate their dispute, I must next determine the appropriate resolution of this case.  Defendant urges the Court to dismiss the suit (*see* ECF 19 at 12-13), whereas plaintiff contends that a stay would be the more appropriate remedy.  *See* ECF 20 at 35-37.

As mentioned, there is "tension" within the Fourth Circuit regarding whether dismissal or a stay is appropriate when granting a motion to compel arbitration.  *Aggarao*, 675 F.3d at 376.

Ordinarily, the "'proper course of action when a party seeks to invoke an arbitration clause is to stay the proceedings pending arbitration,'" under Section 3 of the FAA, "'rather than to dismiss outright.'" *Aggarao*, 675 F.3d at 376 n.18 (citation omitted). However, Fourth Circuit case law indicates that dismissal, rather than a stay, may be "a proper remedy when *all* of the issues presented in a lawsuit are arbitrable." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001) (emphasis added); *see also Aggarao*, 675 F.3d at 376 n.18 (discussing *Choice Hotels* and status of circuit split as to "whether a district court has discretion to dismiss rather than stay an action subject to arbitration").

As Judge Chasnow noted in *Taylor v. Santander Consumer USA, Inc.*, DKC-15-0442, 2015 WL 5178018, at *7 (D. Md. Sept 3, 2015), despite the "disagreement within the Fourth Circuit as to [whether] dismissal is appropriate, . . . district courts within the Fourth Circuit have continued to find dismissal appropriate." *See, e.g.*, *Cuenca-Vidarte v. Samuel*, GJH-20-1885, 2021 WL 5742066, at *12 (D. Md. Nov. 30, 2021) ("Because Plaintiff Cuenca-Vidarte's claims against the APC Defendants are fully subject to arbitration and the agreement is itself valid, . . . her claims as to the APC Defendants are properly subject to dismissal.") (citing *Choice Hotels*, 252 F.3d at 709-10; *Bowers v. WebstaurantStore*, DKC-20-3533, 2021 WL 4864220, at *1 n.1 (D. Md. Oct. 19, 2021) (staying case where parties disputed whether all issues were arbitrable); *Mason v. Domino's Pizza, LLC*, DLB-20-1908, 2021 WL 4820520, at *6 (D. Md. Oct. 15, 2021) (reasoning similarly); *Garrett*, 2018 WL 3579856, at *4 ("The FAA requires a district court to stay judicial proceedings involving issues covered by arbitration agreements.   Dismissal is also a proper remedy under the circumstances.") (internal citation omitted).

In this case, the parties agreed, pursuant to the Arbitration Agreement, to arbitrate "any claim, dispute, and/or controversy that either the Employee or ATI may have against the other."

ECF 19-2 at 5.  Further, the Arbitration Agreement defines the terms "'claim, dispute, and/or controversy'" to include "any claims of discrimination and harassment" as well as "any claim, dispute, or controversy, including class action claims, which would otherwise require or allow resort to any court or other governmental dispute resolution forum arising from, related to, or having any relationship or connection whatsoever with Employee's seeking employment with, employment by, termination of employment, or other association with ATI, whether based on tort, contract, statutory, or equitable law, or otherwise." *Id.*

Thus, by its plain terms, the Arbitration Agreement encompasses each of the Amended Complaint's ten counts.  Indeed, Malamatis does not advance any argument to the contrary. Accordingly, I shall dismiss plaintiff's suit, without prejudice.

## IV.   Conclusion

In view of the foregoing, I shall deny the Clarification Motion and I shall grant the Arbitration Motion.  I shall dismiss the Complaint, without prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date:  May 19, 2022                                    _____/s/_____

                                                       Ellen Lipton Hollander
                                                       United States District Judge

- 49 -